HOLDSWORTH v. SHANNON, *et al.*, *Appellants*.

Division Two, January 31, 1893.

1. **Deed of Trust**: SALE: INADEQUATE CONSIDERATION. While it is the general rule that mere inadequacy of price without more, unless so great as to shock the moral sense, is insufficient to set aside a sale of land made under a deed of trust foreclosure, yet in such case the sale must have been fairly conducted in all other respects.

2. ———: SALE AT UNUSUAL HOUR: INADEQUATE CONSIDERATION. In an action by a creditor in a deed of trust to set aside a sheriff's sale thereunder, it appeared that the sale was made at an unusual hour of the day, that the land brought but little more than one fourth its value, that the agent of the creditor was on his way to attend the sale to protect his interests and would have arrived in time if the sale had taken place at the usual hour of the day. *Held*, that the purchasers not occupying the attitude of innocent purchasers the sale was rightly set aside by the trial court.

3. ———: ———: ———. The fact that the sheriff-trustee was pressed with other duties did not authorize him to sell at an unusual hour and to the detriment of the interests involved in the trust deed.

4. **Pleading**: "INNOCENT PURCHASER." The issue of "innocent purchasers" cannot be raised by a general denial but must be affirmatively pleaded and the *onus* lies on the pleader.

*Appeal from Jasper Circuit Court*—HON. M. G. McGREGOR, Judge.

AFFIRMED.

THIS proceeding was instituted in the Newton circuit court to set aside a sale of the northeast quarter

of section 25, township 24, range 32 in that county. The sale was made by Shannon, sheriff, acting as trustee in lieu of J. B. Watkins who had declined to act.

On October 1, 1883, one Ida F. Hibbard executed her note to Holdsworth the plaintiff for the sum of $600, and to secure it gave a deed of trust of even date on the property mentioned, and also on the southwest quarter of the same section, etc. The note matured October 1, 1888, and remained unpaid. The sale mentioned occurred April 24, 1889, and the petition herein was filed May seventh next thereafter. Other than facts already mentioned, the substance of the petition is the following: That plaintiff sent an agent to attend the sale and bid on the property to the full amount of the debt due, so as to secure his debt, then amounting with interest to $720; that this agent was on his way to Neosho and would have reached there, and did reach there in ample time to have attended the sale had it been made within the usual hours; but that the sheriff-trustee, in disregard of his official duties, sold the land in question at an unusual hour, to-wit, at ten thirty A. M. of the day of sale, when plaintiff's agent was not present; that said sheriff, acting in collusion with defendants Hinton and Harbison, sold the northeast quarter aforesaid to them for $121, when there were no other bidders present; that plaintiff's agent arrived at the courthouse door at twelve o'clock M. of the day of sale, and Shannon the sheriff, having left town, went to his deputy Johnson, and demanded a resale of the property described in the deed, and then and there offered to bid for the same the full sum then due on the note and costs, which demand and offer said deputy denied and rejected; that Hinton and Harbison were fully aware that the sale was made at an unusual hour; that the property was worth much more than the bid made therefor, to-wit, $1000; that plain-

tiff is ready and willing, upon a resale of the premises, to bid the full amount of the debt due and all costs; that Ida F. Hibbard, the debtor, is wholly insolvent, so that if said sale be not set aside, plaintiff cannot recover or realize the amount due on said note; plaintiff, therefore, prays that said sale and all proceedings thereunder be set aside, and for other and further relief.

The answer of the defendants was a general denial.

The testimony of the sheriff, as taken from the abstract of plaintiff, with emendations and additions from the record, is substantially this:

John F. Shannon: "I was sheriff of Newton county in April, 1889 at the time the sale in this case was made, and I made that sale as such sheriff. The sale was made near eleven o'clock A. M. of that day. I do not recollect whether it was before or after that time,—probably a few minutes before. The only thing I recollect it by was the 'Frisco train coming in, and my waiting until after that mail was opened. That train was due at Neosho about ten o'clock I think. J. B. Watkins is the only man representing the mortgagee that I had any correspondence with. The letters received from him were dated at Lawrence, Kansas. The advertisement of this sale was made at the request of J. B. Watkins, through his attorney Patterson. I was expecting some one from Lawrence, Kansas, to be present at the sale, and that is the reason I waited for the 'Frisco trains, one from the east, the other from the northwest. I don't recollect at what time the train from the northwest reached Neosho. It was directly after that train began to run into Neosho, and I don't know—or did not then—what its time was. *I just never thought of that train.* I think trains were running regularly over that road at that time; but I do not

know how long they had been.   I do not recollect, but think the trains over this road arrived about twelve o'clock M.   I did not think anything about that train. *If I had thought about it, more than likely I would have expected the man that way;* but I did not.   I generally began my sheriff sales from half-past one o'clock to two o'clock in the day.   *In the course of my duties as sheriff I had never made a sale under a trust deed or an execution as early in the day as I made this one.*   I usually made them about half-past one, after we got back from dinner.   Immediately after making this sale, I went to what is known as the 'Johnson Diggings,' perhaps five miles south of Joplin, and returned about midnight that night.   I left a deputy at Neosho, but I left him no instructions regarding this case.   I recall as being present at this sale Mr. Hinton, Mr. Cravens, Maj. Harbison, Thomas Lackey, N. H. Manfir.   Mr. Hackney, of Carthage, was standing near, and Mr. Hazeltine, of Springfield, were the gentlemen I was going into the country with, and they were waiting for me.   I came to make this sale at this time of day in this way:   Circuit court was in session, and the day before this a writ of ouster was issued against a party at the 'Johnson Diggings.'   The parties to take possession of the land were to be there on the 'Frisco train, and Mr. Hackney and Mr. Hazeltine wanted me to start immediately.   I told them I had a sale to make, and would have to wait until the train came in and the mail was opened.   I thought some one would come on that train, or that I would get a letter, telling me what to do.   Nobody came and no letter.   I had asked the real estate men and lawyers in town if they represented the Watkins company, and none of them had any such authority, and, after finding that no one came and no letter of advice, I sold the land and went with these gentlemen to attend the writ of ouster.

"Had it not been for the circumstances I have related, I would not have made the sale at that time of day. *In fact I know I wouldn't. It was not the custom.* My recollection is that the northeast quarter was sold first. I think, perhaps, there were two or three bids on this. I think Mr. Geyer and Mr. Lackey bid on both pieces, but am not sure. I was familiar with lands in that neighborhood, but do not know that I ever saw this land—either before or since. I knew the character of the land, to some extent, at that time,. The land in there varies a good deal from the fact that where it lies in the valleys it is very good land, while those flint hills are not so good. But whether this (tract) takes in the flint hills or valleys, I don't know; that would make a great difference to me in the value of the land. It was my judgment that the land as a whole was worth more than it was sold for; but, at the same time, I have sold land there as low as I sold this. I did not pay any attention to the trains arriving on the Splitlog road from the northwest, for these gentlemen who were waiting for me to go with them had a team standing in the street at the time, and as soon as the sale was made, I got into the hack and went with them.

"At that time, April 24, 1889, I do not think there was any mail brought in on the Splitlog road. Up to that time, the travel to and from Kansas City had been by way of Pierce City. I was only looking for somebody by the 'Frisco route. The other route never entered my mind at all. I don't recollect whether the Watkins company ever sent me a letter or message that they expected to attend the sale. I have a letter where they asked me to send them a copy of the paper wherein the notice was printed. I did not have any request to defer the sale, in the event that parties did not come. There was a question asked me awhile

ago, whether they (the Watkins company) would have somebody on the ground? From reading this letter, I see, in their first letter they asked me to recommend to them some attorney at Neosho to attend to their business; and I recommended Mr. Cravens either in my reply or else I showed the letter to him and he promised to write them and told me he had written them, and my understanding from Mr. Cravens was that he would attend to the sale, and he said on the morning of the sale, 'that he guessed he would attend to it.' He was present at the sale and I supposed he would be a bidder. The date of sale was fixed in the notice by The Watkins Land & Mortgage Company. They furnished the form of notice. There was no collusion between me and these purchasers at all, more than between me and every real estate man there, and every lawyer that I inquired of that morning. I notified them that this land was to be sold, and that it was nearly time for the sale; but I had no letter of advice, and did not know what to do. As far as any contract is concerned between the parties to buy that land, or between me and Mr. Hinton and Mr. Osborne, or any other parties to buy the land, there is nothing in it. Mr. Hinton and myself officed together there, at that time. He was there at the time, and, just before going out to sell the land, I spoke to him and said I was going to sell some land; and whether he said he would bid or not, I do not know; but he followed me out, and I believe he said he would bid on it. I may have told him what the land was. The bulk of my sales have been execution sales, but I have never sold before or since a piece of land at this hour. I have sold land at three o'clock, and sold one piece a short time ago at four o'clock. If I ever made a fair sale in my life, it was this one, for I took the pains to speak of the sale to a great many, and spent over an hour

that morning trying to find the agent of the company. I put off the sale to as late an hour as I could, in the discharge of my other duties as sheriff. The bidders paid the amount of their bids, and I executed deeds. I paid the printer's fee, $16.25, and my fee, $3.46, and sent the balance to J. B. Watkins, $153.59, by draft, which they returned and refused to accept.

"The money is still in my hands, except the $16.25, which I paid for advertising. I think the deeds were made the next day. My special object in looking for a representative of the trustee or mortgagee was to attend to the business entrusted to me, and also because I was making the sale *at an unusual hour*, though I would probably have made the same search in the afternoon. The parties who bid at this sale were mostly real estate men, and others who attend sheriff's and execution sales. Two of them, Mr. Geyer and Mr. Hinton, had offices in the courthouse and were county officials.

"Sales are usually made at the east front door of the courthouse. At that time, the postoffice was almost directly in front of the east end of the courthouse—some one hundred and fifty feet away. About that time in the day, there are generally more people around for their morning mail. The mail was open, and the people were coming and going from the postoffice. They could have heard me from the postoffice crying the sale."

Cravens, in his testimony, denies that he made any statement to the sheriff that he would represent the Watkins company; but his testimony does bring out one fact very conspiciously, a fact in which the memory of the sheriff seems at fault; Cravens says: "I think about the time Shannon received his first notice from the company that they wanted the mortgage foreclosed, they requested him to recommend some

reliable attorney there; and they *wanted to employ some one to represent them at the trustee's sale.*"

Other facts disclosed by the testimony will be noticed as necessary hereafter. The court below found that the sale was made at an unusual hour; that the land was sold for an inadequate price; that the sale was fraudulent and void and that the defendants Hinton and Harbison were not innocent purchasers.

*John T. Sturgis* for appellant.

·(1) The evidence shows that this land brought a fair price. Inadequacy of price alone is not sufficient to set aside the sale, certainly not, unless the inadequacy is gross. *Landrum v. Union Bank,* 63 Mo. 48; *Phillips v. Stewart,* 59 Mo. 491; *Wagner v. Phillips,* 51 Mo. 117; *Carter v. Abshire,* 48 Mo. 300; *Glide v. Dwyer,* 83 Cal. 477; *Clark v. Simmons,* 150 Mass. 357; *Kline v. Vogel,* 11 Mo. App. 211; *Million v. McRee,* 9 Mo. App. 344; *Northrup v. Cooper,* 23 Kan. 432. (2) That the sale is made at an early hour of the day, if eleven o'clock can be called an early hour, is not sufficient to avoid the sale. *Hammond v. Scott,* 12 Mo. 8. This case is directly in point as the court there says that cases may often arise where it is necessary for the sheriff to sell early or late on account of other official duties. Such was this case. (3) The sheriff was not notified that an agent of the beneficiary would be present or requested to wait for him. He could easily have been there at the hour of sale. Courts will not relieve against negligence. *Francis v. Church,* Clark (N. Y.), 217; *Railroad v. Creed,* 70 Cal. 497; *Babcock v. Canfield,* 36 Kan. 432. (4) Rights of purchasers should be regarded as well as those of grantors and beneficiaries. 2 Jones on Mortgages [3 Ed.] sec. 1673; *Gardiner v. Schermerhorn,* Clark (N. Y.), 217.

(5) Actual tender of sum paid by the purchaser is a condition precedent to the right to maintain a suit to set aside the sale. *Farquahar v. Iles*, 39 La. Ann. 876. (6) In this case the day and hours of sale were fixed by the party now seeking to set the sale aside. The sheriff as trustee, while an agent for both parties, was acting at the request and suggestion of the beneficiary, plaintiff in this cause. The trustee followed those directions, sold on the day and between the hours designated and as late as his duties would permit. The sale was open and fair; a good crowd was present and a good many bidders. While fraud and collusion between the trustee and purchasers is charged, it is wholly unsupported by the evidence and was openly disclaimed by plaintiff at the trial.

*O. L. Cravens* also for appellant.

(1) The sale was open and fair and nothing done by the purchasers to prevent the property from selling at a higher price. As a matter of public policy the sale ought to be upheld if no act was done by the purchaser tainting it with fraud. Jones on Mortgages [4 Ed.] sec. 1676; *Wornell v. Nason*, 83 N. C. 32; *Holden v. Vaughan*, 64 Mo. 588; *Nelson v. Brown*, 23 Mo. 13; *Meir v. Zelle*, 31 Mo. 331; *Parker v. Railroad*, 44 Mo. 415; *Fairfax v. Muse*, 4 Munf. (Va.) 124; *Campbell v. Swan*, 48 Barb. 100; · *Roberts v. Roberts*, 13 Gratt. 639; *School v. Snell*, 19 Ill. 156. (2) The original deed of trust provided that in the event of a sale at public auction it should occur between 9 A. M. and 5 P. M. The notice sent by plaintiff to the sheriff embraced that provision, and the sale took place between those hours, namely, just before or just after 11 A. M., and at a time when more bidders were present than could reasonably be expected at any other hour of

the day.   The defendants, Hinton and Harbison, did
not procure the sale to be made at the time it was.
They were casually present as other bidders and the
court erred in finding them to be not innocent pur-
chasers.  *Hammond v. Scott*, 12 Mo. 8; *Isbell v.
Kenyon*, 33 Mich. 63; *Baring v. Moore*, 5 Paige, 48;
Jones on Mortgages [4 Ed.] sec. 1906; *Evans v. Rob-
berson*, 92 Mo. 192.   The law will not relieve a party of
his own negligence, and plaintiff's representative did not
come by what was at that time the recognized route of
travel between Kansas City and Neosho, viz., the
"Frisco Line."  (3) The amount for which the land
sold was not inadequate.   *Allis v. Sabin*, 17 Wis. 626;
*Phillips v. Stewart*, 59 Mo. 491; *Landrum v. Bank*, 63
Mo. 48.   (4) The parties by their contract, viz., the
grantor and *cestui que trust* in the deed of trust, specifi-
cally agreed that the sale should be between 9 A. M. and
5 P. M.   There is no custom about sales of this charac-
ter occurring at any particular hour, further than bus-
iness hours, as shown by the testimony.   2 Parsons on
Contracts [5 Ed.] 546, and note.

*W. J. Patterson* for respondent.

(1) Every allegation of the plaintiff's petition is
fully sustained by the evidence, with the possible
exception of the alleged collusive agreement before the
sale between the sheriff and purchaser.   The sale was,
therefore, rightly set aside.   *Cole Co. v. Madden*, 91
Mo. 585; *American Wine Co. v. Scholer*, 85 Mo. 496;
*Strong v. Catton*, 1 Wis. 471; *Lefevre v. Laraway*, 22
Barb. 168; *Howell v. Hester*, 3 Green's Ch. 266;
*Beckwith v. Mining Co.*, 87 N. C. 155; *McKee v. Logan*,
87 Mo. 524; *Parker v. Railroad*, 44 Mo. 415; *Nelson v.
Brown*, 23 Mo. 13; Rorer on Judicial Sales, sec. 438;
*Shaw v. Potter*, 50 Mo. 281; 2 Story's Equity Jurispru-

dence, sec. 1334; *Conway v. Nolte*, 11 Mo. 75. (2) The defense of innocent purchasers is not supported by the evidence; besides a purchaser at a judicial sale takes *caveat emptor*. *Keiser v. Gammon*, 95 Mo. 217.

SHERWOOD, J.—The salient questions which lie at the threshold of the investigation necessary in regard to the merits of this controversy are three, and these: *First*. Was the sale made at an unusual hour? *Second*. Was the property sold for an inadequate price, which, coupled with other circumstances, authorized the sale to be set aside? *Third*. Are the defendants, Hinton and Harbison, to be regarded as innocent purchasers, that is, purchasers without notice and in good faith.

Of these in their order.

I. As to the first. The preponderance of the testimony shows the sale occurred just before eleven o'clock. The testimony of Shannon, the sheriff trustee, leaves no doubt on the point if we are to look to his testimony alone; it is conclusive on the point of the sale in question having been made at an unusual hour, and conclusive also of the prevalent custom to make such sales at a later period in the day. He says: "I generally *began* my sheriff's sales from half past one o'clock to two o'clock in the day. In the course of my duties as sheriff *I had never made a sale under a trust deed or under an execution as early in the day as I in fact made this one*. I usually made them about half past one after we had got back from dinner. * * * Had it not been for the circumstances I have related, I would not have made the sale at that time of day. In fact, *I know I wouldn't; it was not the custom*."

The testimony of other witnesses corroborates that of the sheriff as to the customary time of making such sales. Hinton, one of the defendants, says: "Sales are most usually made after dinner." Osborne, a

witness interested in the same trustee's sale, though in regard to another tract of land, says: "The bulk (of sales) is made between twelve and five o'clock." Geyer, another witness, says: "The majority of the sales are made about one o'clock, or between one and two o'clock." Other witnesses testify about sales having occurred before the customary time as heretofore mentioned; but not one of them is able to state that such sales did not occur *with the consent and in the presence of all parties in interest.*

The occasional occurrence of some such sporadic instances would be but the exception which proves the rule, and would have no more power to break the bands of the prevalent custom than would the early advent of a single swallow to break the icy chains of winter and bring on untimely wing the balmy influences of the vernal season. The finding of the circuit court was that the sale took place at an unusual hour, and we see no reason to disapprove of the correctness of that conclusion.

II. Was the land sold at an inadequate price? On this point, as might be expected, the opinions of the various witnesses differ considerably. The estimates placed upon the value of the land in litigation varies in amount from $1 to $4 per acre. Now if we strike a mean between the highest and the lowest estimates of value, we find that this will place the reasonable price of the land at $2.50 per acre, which amounts to $400 for the tract; and this is what Hinton asked the representative of the Watkins company for it, when approached by him a week or so after the sale, in order to see if an adjustment could not be affected. This one hundred and sixty acres had a hewed log house on it with a stone chimney, stables and smokehouse, and about ten acres in cultivation, also an excellent spring on the tract, and about forty acres of it, taking differ-

ent portions of it for that purpose, could be put in cultivation.   The sum of $400, then, ought to be taken as a reasonable price for the land, especially so, as Wills, who was interested in the purchase of the southwest quarter, says that quarter "was worth probably $250 to $300;" but it is conceded on all hands that the last-named quarter, by reason of having no. improvements or spring on it, was much less valuable than the one in suit.   So that if $400 is to be taken as the proper estimate to place on the value of the property in controversy, then its sale for $121 was a sale for but little over one fourth of its value.

The general rule is stated in the books that mere inadequacy of price without more, unless so gross as to shock the moral sense, is insufficient to set aside a sale of land made under a deed of trust, foreclosure or execution.   But in such case, the sale must be fairly conducted in all other respects.   Several instances have occurred where this court has set aside sales where the price was inadequate, though not grossly so, where there were other attending circumstances, rendering it inequitable to let the sale in the given instance stand; as for example, in *Stoffel v. Schroeder*, 62 Mo. 147, where the property sold under a deed of trust at $5,000 and was worth $8,500, and the sale was set aside, having been made at an unusual hour, to-wit, eleven o'clock A. M.   It is true that case smacked of fraud, while this does not; but in one respect they are parallel in principle, that is, the trustees in the former case and the sheriff-trustee in the latter, were prevailed upon to sell the property at an unusual hour, and in consequence of this, the property in the case at bar only brought about one fourth of its reasonable value.   The fact that the sheriff-trustee was pressed to attend to other duties did not authorize him to do this to the

neglect of other duties and the détriment of other interests.

In *Vail v. Jacobs*, 62 Mo. 130, where property worth from $5,000 to $8,000, was struck off to the assignee of the notes, the only bidder at the sale, for $1,000, we set the sale aside, though it was made within usual hours. In the cases mentioned, others are instanced from our own reports teaching the doctrine that a trustee in the exercise of the power of sale, must act with the strictest impartiality and integrity, and, if it appear that they have abused their trust in any manner by a fraudulent combination with anyone to the detriment of any party in interest, or even if it appear that substantial injury has resulted from their acts in failing or neglecting to discharge their duties by exercising a wise and sound discretion, equity will grant relief. *Goode v. Comfort*, 39 Mo. 313.

In *Stoffel v. Schroeder*, *supra*, we said: "It has always been the doctrine of this court, as well as of courts elsewhere, that the mode of sale referred to, being a harsh method of disposing of the equity of redemption, should be watched with jealous solicitude, and overthrown, if not conducted with all fairness and integrity, and that the trustee is bound to act *bona fide*, as, in exercising the power, he becomes the trustee of the debtor, and should adopt all reasonable modes of proceeding in order to render the sale beneficial to the debtor, and cannot shelter himself under a bare literal compliance with the conditions imposed by the terms of the power."

Shaw, C. J. in *Howard v. Ames*, 3 Met. 311, said: "In executing the power he becomes the trustee of the debtor, and is bound to act *bona fide*, and to adopt all reasonable modes of proceeding, in order to render the sale most beneficial to the debtor."

Vice-Chancellor Sir Knight BRUCE uses this language: "A mortgagee having a power of sale cannot, as between him and the mortgagor, exercise it in a manner merely arbitrary, but is, as between them, bound to exercise some discretion; *not to throw away the property*, but to act in *a prudent* and *business-like manner*, with a view to obtain as large a price as may fairly and reasonably, with due diligence and attention, be under the circumstances obtainable." *Matthie v. Edwards*, 2 Coll. 465.

Tested by the standard thus fixed by the authorities, it cannot justly be said that the sheriff-trustee fulfilled the measure of his duty if that duty be considered only with reference to the value of the property and the price which it brought.

But we need not look alone to the inadequacy of the price for which the land sold, nor the unusual hour at which the sale occurred; there is yet another element presented by the testimony for consideration, and that is the fact that the agent of the plaintiff, in the exercise of due diligence, and without fault on his part, failed to reach the place of sale in time to participate therein, and prevent a sacrifice of the property. This makes a stronger case than where a party through mistake or inadvertance of himself or agent has failed to attend a sale. Yet, even in cases of that sort, relief has frequently been afforded in equity, on the ground of *accident or surprise*. Thus in *Williamson v. Dale*, 3 Johns. Ch. 290, plaintiffs were innocently misled as to the day of sale, and so were not present. No improper intention was imputable to the adverse party, nor of unfair conduct at the sale, which was perfectly regular and fair; but the property estimated to be worth $12,000, subject to a prior incumbrance of $2,700, was sold for a like sum. and the sale was set aside, on

the ground of *surprise;* equitable terms being imposed upon the applicants for relief.

In *Bixly v. Mead*, 18 Wend. 611, the plaintiff employed an agent to attend the sale and bid in the property for him; agent forgot to do so; property sold at a sacrifice; purchaser insolvent; sale set aside.

In *Howell v. Hester*, 3 Green. Ch. 266, a *second mortgagee*, by mistake of her agent, was prevented from attending the foreclosure sale made under a *prior incumbrance*. The premises sold for an inadequate price, to-wit, $100, when worth $500, to the prejudice of the second incumbrance; sale set aside.

So in *Seaman v. Riggins*, 1 Green. Ch. 214, agent of a *second incumbrancer* failed to reach the place of sale in time, owing to accident in missing his way, and to another unintentional mistake. The sale was advertised for one o'clock and occurred at half past one. Owing to the mistake and accident aforesaid, the agent did not reach the point until two o'clock. The property was sold for only sufficient to satisfy the first mortgage; but was worth enough to satisfy both mortgages, and the mortgagor was insolvent; the sale was set aside on equitable terms.

In *Griffith v. Handley*, 10 Bosw. 587, defendant's attorney made a mistake as to the day of sale; property sold greatly under value, without much competition. Held a case of surprise, which, coupled with inadequacy of price, justifies setting the sale aside, which was done.

In another case the petitioner holding the equity of redemption, and, innocently misled as to the day of sale, was prevented from attending, and in consequence the property was sold for about *sixty per cent. of its value.* Held, such a case of surprise coupled with inadequacy of price as justified setting the sale aside.

*Wetzler v. Schaumann,* 24 N. J. Eq. 60.   To the same purport is *Collier v. Whipple,* 13 Wend. 224.

In *Hoppock's Ex'r v. Conklin,* 4 Sandf. Ch. 582, the defendant in a foreclosure suit, liable for any deficiency, intended to be present at a foreclosure sale, but was prevented by being detained as a juror, and vainly tried to get the court to excuse him, and, failing in this, wrote to an entirely reliable agent to represent him and bid in the property for him.   Letter failed to reach agent till an hour after sale; property bid in by complainants for one third of its value, leaving a large deficiency.   Court ordered a resale.   It is true these cases from which quotations are just made were *foreclosure cases* where deeds had not been executed; but they serve to illustrate the doctrine of courts of equity on the point in hand.

In the case at bar the plaintiff had done everything required of him.   No just charge of negligence can be laid at his door.   He had even gone further than parties in interest had gone in the cases instanced; *for he had written a letter to Shannon informing him that they wished an attorney to represent them at the trustee's sale,* and this only a few weeks before it occurred.   *It was the duty of the sheriff to have remembered this letter,* and, even if the sale had occurred at a *regular hour,* to have postponed the sale for a short time and awaited the arrival of the expected agent.   *Seaman v. Riggins,* 1 Green Ch. *loc cit,* 218.   But the failure of the sheriff to remember, should not operate detrimentally to the interests of the plaintiff, whose only hope for the satisfaction of his debt is the relief he seeks.

III.   Are the defendants to be regarded as purchasers without notice and in good faith?   There is sufficient testimony in this record to show notice to them before they paid the purchase money.   But they cannot occupy the attitude of such purchasers, for the reason that their *pleading* does not warrant it.   Their

answer was a general denial.   The plea of "innocent purchaser" is an *affirmative defense, and must be affirmatively pleaded and proven;* the *onus* lies on the pleader.

In *Frost v. Beekman*, 1 Johns. Ch. 288, Chancellor KENT says:   "If a purchaser wishes to rest his claim on the fact of being an innocent *bona fide* purchaser, he *must deny notice, though it be not charged; he must deny fully and in the most precise terms every circumstance from which notice could be inferred.*"   See also, *Halsa v. Halsa*, 8 Mo. 303, and *Sillyman v. King*, 36 Iowa, 208, and cases cited.

For the reasons aforesaid, judgment affirmed. GANTT, P. J., concurs; BURGESS, J., in affirming the judgment; but reserves his opinion on the question of pleading.