REISENBERG v. HANKINS et al.* .
(No. 2255.)

(Court of Civil Appeals of Texas. Amarillo. Jan. 30, 1924. Rehearing Denied Feb. 27, 1924.)

1. Pleading ⬅403(2)—Defective allegations of fraud in petition held cured by allegations of answer.

A petition in a suit to set aside sale of mortgaged property on mortgagor's default in interest payments, even if fraud was not alleged specifically enough to sustain the judgment, was cured by the answer specifically denying any fraud and declaring that the transaction was fair and legal.

2. Mortgages ⬅369(7)—Evidence held sufficient to show conspiracy to cut off equity of redemption.

In a suit to set aside sale of mortgaged property under a power for about one-third of its value on mortgagor's default in interest payments,. evidence held sufficient to sustain a charge of conspiracy to cut off owners' equity of redemption.

3. Evidence ⬅253(1)—Statements by coconspirator held admissible against defendant.

In a suit to set aside the sale of property under a power contained in mortgage on the ground of fraud and conspiracy, where conspiracy was shown, statements made by defendant's coconspirator were admissible against defendant.

4. Mortgages ⬅591(1)—Equity of redemption is estate in land.

Mortgagor's equity of redemption is more than a mere right; it is an estate in land.

5. Mortgages ⬅351—Sale at noon hour held not a "public sale" within spirit of law.

Even if a sale of mortgaged land under a power by mortgagee's assignee made during the noon hour was within the hours prescribed by law for making such sales, it was an unusual hour, and, if made at that time in pursuance of a fraudulent conspiracy to prevent bidding, it was not a public sale within the spirit of law, and should be set aside.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Public Sale.]

6. Evidence ⬅14—Common knowledge that people in country towns eat between 12 and 1 o'clock.

It is common knowledge that people in country towns are generally at their noonday meal between the hours of 12 and 1 o'clock, and that this is especially true of officers and those who frequent courthouses.

7. Mortgages ⬅360—Mortgagee selling under power must exercise diligence to obtain fair price.

In giving notice of sale under a power, mortgagee is required to act in a businesslike manner with a view to obtaining as large a price as he reasonably can, and in any matter left to his discretion there must be a fair and honest exercise of his judgment.

8. Mortgages ⬅360, 369(7)—Sales under power jealously watched; sale under power set aside on slight proof of unfairness.

Because sales by mortgagees under powers are liable to abuse, they are most jealously watched by courts of equity, and on slight proof of unfair conduct they will be set aside.

9. Mortgages ⬅369(3)—Fraudulent sale under power voidable.

Though a junior incumbrancer is not as a general rule entitled to notice of sale made under power in the mortgage, any fraud or misconduct which results in preventing a fair sale and competitive bidding renders the sale voidable.

10. Mortgages ⬅369(3)—Inadequacy of price alone not sufficient to set aside sale under power. ·

Inadequacy of price alone is not ordinarily sufficient to set aside sale of mortgaged property under a power, but, when it is shown that such inadequacy is due to any misconduct, fraud, or unfairness of mortgagee, equity will avoid the sale.

On Motion for Rehearing.

11. Appeal and error ⬅742(1) — Appellate court should not consider arguments in brief not covered by propositions.

Where no proposition in defendant's brief challenges the sufficiency of plaintiff's allegations of fraud, the appellate court should not have considered the argument thereof in defendant's brief.

12. Pleading ⬅403(2)—Defect in petition supplied by answer held unimportant.

Where plaintiff's petition fails to make a necessary averment of fact, but the omission is supplied by allegations in the answer, even

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction April 16, 1924.

though a demurrer to petition on that ground is overruled, the defect is unimportant, and the appellate court is not justified in reversing the case for that reason.

**13. Appeal and error ⬀1032(1)—No presumption that error in overruling special exceptions to pleading is ground for reversal.**

Under rule 62a, there is no presumption that an error in overruling special exceptions to pleading is ground for reversal, but the burden is on the complaining party to show injury.

**14. Appeal and error ⬀171(1) — On appeal case must stand or fall on issue on which tried.**

Where fraud was understood by both parties and the court to be the controlling issue in the trial, and the trial was had on that theory, the case must stand or fall on such theory on appeal.

Appeal from District Court, Childress County; J. V. Leak, Judge.

Suit by Henry Hankins and another against Robert Reisenberg. Judgment for plaintiffs, and defendant appeals. Affirmed.

Whitehurst, Church, Read & Bane, and L. H. Betts, all of Dallas, for appellant.

Jos. H. Aynesworth, of Wichita Falls, and C. A. Williams, of Childress, for appellees.

HALL, C. J. The appellees, Henry Hankins and Claude Terrell, filed this suit April 4, 1923, in the district court of Childress county, alleging in substance that they were the owners of certain lands situated in said county; that January 1, 1914, H. Smiley, who then owned said lands, executed a mortgage thereon in favor of Maxwell & Maxwell, to secure a note for about $2,000 which said note and lien had been renewed and extended by W. D. Smiley, the vendee of H. Smiley, and by such extension the note matured on the 1st day of January, 1924; that said note provided that the interest should become due and payable on the 1st day of January of each year thereafter. The mortgage provided that a failure to pay interest or any installment thereof for 5 days from the date it became due should, at the option of the holder of the note, mature the whole indebtedness. The mortgage further contained a power of sale, authorizing the mortgagee, his assigns or legal representatives, after notice as required by law, to sell the property in satisfaction of the debt, said sale to be made on the first Tuesday in some month between the hours of 10 o'clock a. m. and 4 o'clock p. m., to the highest bidder for cash at the courthouse door of the county in which the land was situated. It provided that notice should be given by posting three written or printed notices, one at the courthouse door of said county and the others at two public places in the county, 20 days prior to the date of sale. The mortgage contained the further usual

stipulations that all statements or other recitals in deeds made by the mortgagee as to the breach of covenants, giving of notice, etc., should be taken as prima facie evidence that the terms of the mortgage had been fully complied with. It is further alleged that said note and mortgage had been conveyed by Maxwell & Maxwell to John Hancock Life Insurance Company, and by said company to Reisenberg; that Reisenberg and one A. P. Minchew schemed and conspired together to defraud the plaintiffs of their lands and interest therein; that the said Minchew caused the said Reisenberg to purchase and acquire the note and to sell the land without notice to appellee of unpaid interest installments; that in pursuance of said fraudulent conspiracy the land was sold on the 3d day of April, that being the first Tuesday of said month, 1923, and purchased by Reisenberg himself. They allege if they had known of the proposed sale they would have paid the interest and the note; that the land was worth about $10,000; and that Reisenberg had purchased it at his own sale for the sum of $2,450. They prayed that the sale be set aside; that Reisenberg be enjoined from recording his fraudulent deed; and that they be quieted in their title. By supplemental petition they tendered the full amount of the note, interest, and costs.

The appellant Reisenberg answered by general demurrer, several special exceptions, general denial, and specially pleaded that about the 1st day of March, 1923, he purchased the note and mortgage in question from the John Hancock Insurance Company through the Maxwell Investment Company; that at said time the interest was more than 5 days past due; that he posted notices, as required by law and by the mortgage, and at said sale purchased the land at a fair and equitable price at a sale held in accordance with the terms of the note and mortgage, and in accordance with law. He denied the allegations of conspiracy with Minchew, and alleged that there was no fraud connected with said sale. By cross-action he sued in trespass to try title, alleging his damages at the sum of $5,000. By way of further cross-action he set out the fact of the execution of the note and mortgage by Henry Smiley, the extention of the note and lien by W. D. Smiley and wife, the failure of the appellees to pay the interest; that the principal sum of $2,000, and the interest from January 1, 1922, to January 1, 1923, at the rate of 6½ per cent. per annum, was due, together with interest on the interest from January 1, 1923, and prayed that in the event the sale should be set aside that he have judgment for the amount of the note, principal, interest and attorney's fees, for a foreclosure of his lien and for costs. A plea of privilege was overruled. On final hearing the court rendered judgment for the appellees, setting aside the sale,

---

⬀For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

annulling the deed executed by Reisenberg as mortgagee to himself on the 3d day of April, 1923, gave Reisenberg judgment for the full amount of his note and interest, aggregating $2,248.70, decreed the title and possession of the land to appellees, and adjudged the costs against Reisenberg. The injunction restraining Reisenberg from filing his deed for record was made permanent.

[1] The first contention to be noticed is that the appellees' petition is not sufficient to sustain the judgment. After setting out the various fraudulent acts, it is alleged:

"All of which was done in the utmost secrecy and with the particular intention that such action should not become known to plaintiffs or their attorney."

It may be that the allegations of fraud made in the petition are not specific and full enough to sustain the judgment, but the defect, if any, has been cured by the allegations of the answer, specifically denying any fraud, and declaring that the sale, and, in fact, the whole transaction, was fairly and legally made. Numerous propositions are brought forward by the appellant in his brief, which it will not be necessary to consider in detail. It is urged in substance that where the land is sold under power of sale conferred by a mortgage, and the notice stipulated for in the mortgage is given, and the statute regulating such sales is complied with, personal notice of the sale to the mortgagor, or those holding under them, are not conditions precedent to the valid sale of the property; that a failure to give personal notice does not amount to fraud; and that such a sale cannot be avoided for mere inadequacy of price alone. That all persons claiming an equity of redemption by a privity of estate with the mortgagor are considered as parties to the proceeding, and are precluded by the sale; that proof is insufficient to show a conspiracy of any such fraud as would support the court's judgment in setting the sale aside.

[2] The findings of the court material to the consideration of the contentions here may be briefly summarized as follows: That Reisenberg, by proper transfers, was owner of the note for $2,000, and the assignee of the mortgage; that Hankins and Terrell are the owners of the land; and that H. Smiley is the common source of title; that the original note was made by H. Smiley to Maxwell; that it had been renewed and extended by W. D. Smiley by an extention agreement with the John Hancock Life Insurance Company, executed January 1, 1919, making said note payable January 21, 1924; that one of the attorneys for the appellees had inquired of H. H. Pennell, the agent of the John Hancock Life Insurance Company, at Childress, as to the interest payments during the month of March, 1923, and was informed by Pennell that he had not received any notice of default in the payment; and that, should the same be unpaid, he would get notice from the insurance company, and would notify said attorney; that the life insurance company was the record owner of the note and mortgage, and continued to be the record owner until Reisenberg sold the land under the mortgage to himself; that Reisenberg and A. P. Minchew, one of the parties under whom appellees obtained title through a judgment and attachment, were intimate friends of long standing; and that prior to to the time Reisenberg purchased the note he had several conversations with Minchew with reference to the land, in which Minchew detailed the circumstances of his litigation with appellees, and in one of said conversations Minchew informed Reisenberg that he had lost out in the suit, and would like to see him, Reisenberg, make something out of it; that Reisenberg obtained the note and mortgage by written transfer on the 6th day of March, 1923, paying full face value therefor, and on the next day wrote an attorney at Childress to post notice advertising the sale of the lands under the mortgage at the next possible date, being the first Tuesday in April, 1923, and paid said attorney $30 for writing out and posting the notices; that notices were accordingly posted; and that Reisenberg never at any time notified appellees of his purchase of the note, and did not file the assignment of said note to him in Childress county, until after the sale was made; and that he gave no notice of his election to declare the note due on account of default in the payment of the interest other than by the posted notices of sale; that A. P. Minchew went to Childress on Monday, April 2d, the day before the sale, and took with him the sum of $3,400, with which, if necessary, to bid upon the land, in the event there were other bidders against Reisenberg; that on the morning of April 3, 1923, and shortly after the arrival of Reisenberg in Childress, he, with Minchew, went in a car to the land in question north of Childress, and did not return until about 15 minutes after 12 o'clock of that day, when they immediately went to the courthouse and made the sale during the noon hour; that no one was present at such sale except Reisenberg and Minchew; and that Reisenberg made the only bid for the land; that Burnett, the county clerk of Childress county, was present in his office nearby when the sale was made, and was the only person about the premises, and he was not called out or given any notice that the sale was being made; that the lands so sold were reasonably worth the sum of $8,000; that the amount due on the note at the time of the trial was $2,248.75; that Reisenberg is in their abstract office in the city of Dallas, making abstracts for Maxwell & Maxwell, agents for the John Hancock Life Insurance Company; and that, if he had made any inquiry, he would have learned that plaintiffs were ready to pay off the interest; and that he

knew that they were the owners of the land subject to the mortgage; that plaintiffs have always been ready, willing, and able to pay off said note, and would have protected themselves by paying it off at the day of sale if they had been notified of the proposed sale. The court further found that Reisenberg had purposely refrained from giving them any notice of his ownership and possession of the note; and that he used the utmost secrecy possible in the advertisement in conducting the sale and all other matters incident thereto; and that it was his purpose not to let plaintiffs know that he was the owner of the note; and that he had declared it due, and posted it for sale; that from the evidence, taken as a whole, and from the acts and conduct of Reisenberg and his association and connection with Minchew, that the whole transaction, from its inception, was fraudulent, and carried out for the purpose, if possible, of defrauding the plaintiff, on account of which fraud the sale should be set aside; that Reisenberg had a secret purpose in purchasing the note to foreclose the same immediately, and, if possible, buy in the land at an unusual hour for the face value of the note. Documentary evidence was introduced to show that the appellees had obtained a judgment against Minchew at a former term of the district court, foreclosing a lien upon the land in question as the property of Minchew, in a suit to which one Morris, J. F. Beeler, W. D. Smiley, and R. M. Bell were also parties; that they had purchased the land under that judgment, subject, of course, to the prior lien existing in favor of Maxwell & Maxwell, to secure the note under which the sale in question was made to Reisenberg. The testimony of Reisenberg bearing upon the issue of fraud and unfairness in the sale as disclosed by the statement of facts is as follows:

"I live in Dallas, and have lived there 12 or 13 years; am engaged in the abstract business for myself; prepare abstracts for Maxwell & Maxwell, making on an average about two abstracts a day for that firm of Dallas county lands only. I have known A. P. Minchew about 12 years; he and I are good friends. He told me about a year ago about the people up here trying to take his land away from him. I talked with him both before and after I bought the note, and he told me that he had lost the land some time previous to that. I learned from Maxwell & Maxwell that the interest hadn't been paid, and I saw the files on the matter in their office. I have met Attorney C. A. Williams; I met him when I came up here to foreclose on the land; I told Minchew when I bought the note that I was going to foreclose. I bought the note on March 6th; was in my office in Dallas when I bought it. I didn't buy the note at the instance of Minchew. Maxwell told me that it was past due, and if I wanted it they would sell it to me. I had told Minchew before I bought it that I was going to buy it, and he said, 'I am out of it and don't care what you do about it.'

That was about the first of March about the time that I first considered buying it. Minchew told me that if I wanted to buy the note to go ahead and buy it; that he didn't have anything to do with it. Maxwell talked to me twice about buying it. My financial worth is about $25,000. I am 32 years old. Minchew did not tell me to go ahead and foreclose. He came up here when I came to foreclose on the note, and I met him here; I had an agreement to meet him here at that time. I made that agreement with him to meet me here at that time in Dallas. We didn't have any agreement to meet here, but he said he was going to be here, and I told him he could be here if he wanted to. I guess that conversation took place in my office in Dallas in the Linz building in Dallas. Minchew happened to be there because we were good friends, and he naturally came around to see me. It isn't a fact that he is an intimate friend of mine. I didn't tell C. A. Williams that Minchew tipped me off and got me to buy the note. Minchew told Williams that he was out of it, and had nothing to do with it, but he rather see me have the land than for the others to have it, and he was glad I bought the note. He said he would rather I would have the land than for this bunch up here to have it. I had one or two conversations with him prior to the time I bought this land. He came to my office on or about the 15th, and said he was coming up here. I didn't have a definite understanding with Minchew to be here on the date of the sale, but he said he would be here, and I told him he could bid on it if he wanted to; anybody would have that right. I paid a Childress attorney to post the notices for me. I had a conversation with Mr. Mowery at the time I was up here, and I believe Minchew introduced me to him, and told me that he, Mowery, would be a good man to sell the land for me if I wanted to sell it. Minchew didn't exhibit a $3,400 cashier's check to Mowery that I know of. The conversation I had with Mowery was in front of the drug store. It is not a fact that Minchew and I had an agreement that I would buy that note and get possession and title to the land to protect Beeler. I know that Beeler had a suit about the land, but do not know him. I know that Judge Diggs was his attorney; I know that Morris claimed an interest in the land in that lawsuit, and had been defeated. When Mr. C. A. Williams asked me why I didn't give him notice I told him I didn't have to do that: I didn't tell him that I gave Morris notice. I think that sale took place at the noon hour; it took place at that time because it was convenient at that hour. I came up and looked at the land, and when I got back from looking at the land I sold it; I sold it at the noon hour because it was convenient to sell it at that hour. I was here all the rest of that day. Mr. Minchew and I went down to the City Guaranty State Bank, and talked to Mr. Williams. Mr. Minchew introduced me to him, and told him that I was the owner of the land and that I had foreclosed on the note. I do not remember about him then asking me about the notice. I told him at that time that I didn't have to give him notice; that I couldn't see where it was incumbent upon me to give them notice when I had posted the notices, as I had always under-

stood that it was up to the landowner to know what was against the land. The interest had been due two or three months at the time I bought it. On the morning of April 3d I got a car and went out to the farm. I asked Minchew to go out there with me because I didn't know the way, and he went; we went about 9 o'clock, I think. I had not seen Hankins and Terrell at that time. I knew that they were claiming an interest in the land, and that they resided here. I didn't know about their ability to pay the note off, and didn't make any inquiry. The note was two months past due, and I. thought if they wanted to pay it they would have paid it. I had several conversations with Minchew, and he told me he would rather I would have the land than anybody else, and he said he didn't have any interest in it. I don't know whether Minchew had any money here on the day of the sale or not. He didn't show me and Mowery the cashier's check for $3,400; I didn't .see it in his possession. Minchew was talking all the time, and I didn't pay much attention to what he said. I didn't see him pull that cashier's check partly out of his pocket and say that he came here with the goods. Minchew was up here and went with me to see the land bcause I had an interest in the land, and. he was a friend of mine, and would rather have his friend have the land than some others. He came up here to bid on the land if he wanted to, but he didn't bid on it. It was about 12:30 o'clock when I got back from the land. The county clerk's office was open, but I didn't call him out to the sale. I made no examination of the records in his office because the John Hancock is a reliable company. I talked with Beeler's attorney when I got here, but didn't tell him I was going to sell the land; he knew that because he posted the notices. I didn't purposely leave town and come back and sell the land when everyone was gone and bid the land in myself. I bought the land because I figured it was worth the money, and I had the money, and might as well put it in that as well as anything else. My bid was the only bid that was made on that land. I made a deed to that land to myself. I just bought the note as an investment, and when they didn't pay it off I posted my notices. I felt that it was up to them to look after the interest payments; I didn't have their interest at heart and give them notice, because they were able to take care of themselves. Up to that time, that is, until April 3d, at 12:15 o'clock, I was willing to accept the amount of the interest and principal and a reasonable amount of costs in lieu of the land, but I am not now willing to do that. Minchew told me what attorney was representing Beeler, and told me that he was an attorney that would do what I paid·him to do."

Mowery testified that he was a real estate broker in Childress, and had been for about 22 years, and acquainted with Minchew, and further testified as follows:

"I met Minchew and Mr. Reisenberg, and Mr. Minchew introduced me to Mr. Reisenberg, and I asked Mr. Minchew what he was doing up here, and he said he was attending the sale. I asked him what sale, and he said the sale of the land in question here. That conversation occurred about the middle of the afternoon. He

told me that Mr. Reisenberg had bought the land. During that conversation Reisenberg was walking around and ·was not listening much. He was not present when Minchew entered into a full and detailed account of the sale, but he was close by. Minchew said these parties who were holding the land didn't 'have any interest in it anyhow; that they undertook to put over a company, and had some promotion stock that hadn't cost them a dime; that he undertook to help them out, and after he went to the bad, and while he was down and out, they were ·the first fellows to jump on him and take his farm away from him, and tried to take his sister's lot away from her; that they and their. attorney had failed to pay the interest, and that he had a good friend that was connected with a loan company, and when the interest wasn't paid he tipped Reisenberg off; that Reisenberg had plenty of money, and was one of his friends, and had bought the note and sold the land and bought it in himself; that these fellows up here jumped on him when he was ˙down and out, and he would rather the lowest down negro in the country would have the land than for those fellows to have it; that Reisenberg had advertised the land and bought it in and had gotten it by, and there was not any of them .that knew anything about it until the land was sold. Minchew mentioned the fact that they had tried to get hold of everything he had; his stuff at Mexia, but that they 'hadn't gotten any of it; that he had several thousand dollars in leases; that they didn't get one of them. Minchew showed me a cashier's check for $3,400, and said he brought that along because he didn't know but that he might need it. I would say that Reisenberg was within two or three feet of Minchew and I at the time of that conversation. Reisenberg didn't go off to the bank while Minchew and I were talking. I know that he went after that, because I saw him and Minchew together there."

Reisenberg, being recalled, testified as follows:

"The money with which I purchased this note wasn't furnished me by Minchew. At the time I purchased that note I didn't have much ready money on hand, and I borrowed some money from Miss Martz."

C. A. Williams, an attorney of Childress, testified:

That he knew and had known Minchew for about˙10 years, and that Minchew introduced him to Reisenberg for the first time on the 3d day of April, the day of the sale, about 1:15 or 1:20 o'clock in the afternoon. "I was on the street crossing, and Minchew told me he wanted to see me, and I went over, and ·he introduced me to Mr. Reisenberg. I had a conversation with them at that time, and Minchew told me that Reisenberg was the man that held the notes against Smiley's farm; that he was connected with Maxwell & Maxwell, and had bought the note and foreclosed on it. I had just stepped up, and they were both facing me and standing about a couple of feet away. I shook hands with Reisenberg, when they told me they had just sold the land at the courthouse. I asked Reisenberg if he had notified Hankins and Terrell, and he said no, they didn't have to do that; that he had just ad-

vertised the land, and sold it, and bought it in himself; that he didn't give them any notice of any kind, except that he posted notices. One of them stated that Mr. Morris was given notice. I remarked during the conversation that I understood all the details in connection with the matter and Minchew remarked, 'You thought you understood a good many things about this matter that you haven't understood.' I said, 'Well, we have had two or three lawsuits, and we may have another one.' Minchew said, 'I have known Reisenberg a good many years, and he is a good friend of mine, and I am glad he got the land. I would rather have anybody to have it than this bunch up here.' Mr. Reisenberg could hear what was said in the conversation, and he took part in it. On the evening of that day I ate dinner at the hotel, and Minchew and Reisenberg ate at the same table, and we had another conversation. It was a table arranged to accommodate four persons. Minchew sat at the end of the end table facing north; I was at the other end facing Minchew, and Reisenberg was seated at the west side of the table to my right. The matter came up again, and we discussed it. I asked Minchew about Beeler's interest, and he said, 'That is all right about Beeler. I came up here to protect his interest if necessary,' and at that time he took the lapel of his coat on the left-hand side, and referred to the inside pocket, and turned down a check, and said, 'You see I came prepared to protect him,' and showed me a check for about $3,400. Mr. Reisenberg was present at that time. It was a conversation that was being carried on by the three of us at the table. In the conversation at the bank Minchew made the statement that he had known Reisenberg a long time, and that they were good friends, and that they had slipped this over; do not remember the words he used, but the substance was that he had informed his friend of the condition of the note, and that he had bought it and sold the land. I made a little inquiry to find out if the interest had been paid. I went to Mr. Pennell, who is an abstract man here in town. about two weeks before the sale, and asked him to look through his records and tell me the condition of the loan, and as to what it showed as to interest payments. He said he was sure the interest had been paid, because he represented the John Hancock people, and if it hadn't been he would be the first one notified about it. That was prior to the time the same was made. I understood the loan company sent out notices of interest payments to become due. Because we paid the interest in 1922, I took it that we would *be notified when the interest was due."

[3-5] The evidence to sustain the charge of conspiracy between Reisenberg and Minchew is much stronger in this case than it was in Griffin v. Palatine Ins. Co. (Tex. Com. App.) 235 S. W. 202, 238 S. W. 637; Id. (Tex. Civ. App.) 202 S. W. 1014, and we think is amply sufficient to show a conspiracy and makes the statement of Minchew admissible against Reisenberg. Minchew was not used as a witness at the trial. The trial judge was justified in discounting Reisenberg's testimony. Reisenberg first admitted that Minchew was his intimate friend; then denied it. He stated twice that Minchew met him in Childress on the day of the sale by previous agreement between them, and then denied it in the next sentence. He said he had the money on hand and bought the note as an investment, and on cross-examination said that at the time he bought the note he did not have much ready money on hand, and borrowed some from Miss Martz. The proof that they conspired to get the note and advertise and sell the land, strictly in accordance with formal legal requirements, but for the fraudulent purpose of cutting off appellee's equity of redemption, is too plain to require discussion. The question is, Did the facts justify the trial court in setting the sale aside? Appellant contends that, since he had the right to buy the note, declare it due after default, and sell the land under the power and buy it in himself, his title cannot be assailed except upon a showing that he has failed to comply with the law or some term of the mortgage in some material particular. We do not so understand the law. The mortgage was executed for the primary purpose of securing the payment of the debt, and not as one step toward vesting title to the mortgaged premises in the mortgagees or their assigns. The power of sale was not inserted primarily for the purpose of enabling the mortgagee to obtain title, else there would have been no provision for a public sale. When the parties stipulated for a public sale they intended that it should be made when bidders might compete to the end that the property might be sold for something near its value, and the excess, if any, over and above the amount necessary to satisfy the debt and expense of sale, should go to the mortgagor, or his assigns. It is the recognition of the mortgagor's right to such excess which has given rise to the equitable doctrine of redemption. The equity of redemption is more than a mere right; it is an estate in the land. 1 Pom. Eq. (4th Ed.) § 162. A sale conducted under such circumstances and in such a manner as to fraudulently defeat the equity of redemption is not a public sale within the spirit of the law. Campbell v. Swan, 48 Barb (N. Y.) 109; 1 Wiltsie Mtg. Forcl. § 639. A sale made at 12:25 or 12:30 p. m. while within the hours prescribed by law for making such sales, is an unusual hour, and, if made at that time in pursuance of a fraudulent conspiracy to stifle and prevent bidding, should be set aside. Holdsworth v. Shannon, 113 Mo. 508, 21 S. W. 89, 35 Am. St. Rep. 719; Fowler v. Taylor, 19 App. D. C. 456.

[6-8] It is a matter of common knowlege that in towns the size of Childress the people generally are at their noonday meal between the hours of 12 m. and 1 o'clock, and that this is especially true of officers and those who frequent courthouses. It is declared that in giving the notice of sale the mortgagee is re-

quired to act in a business-like manner, with a view of obtaining as large a price as he reasonably can, with due diligence on his part, and in common fairness to all others interested, and that in any matter left to his discretion there must be a fair and honest exercise of his judgment. Givens v. McCray, 196 Mo. 306, 93 S. W. 374, 113 Am. St. Rep. 736; Meacham v. Steele, 93 Ill. 135. Because sales by mortgagees under powers are much liable to abuse, they are most jealously watched by courts of equity, and upon slight proof of unfair conduct they will be set aside. Pearson v. Gooch, 69 N. H. 208, 40 Atl. 390; Atkins v. Crumpler, 118 N. C. 532, 24 S. E. 367. The very purpose of a stipulation in a mortgage or deed of trust for a public sale and the publishing of notices thereof is to secure the attendance of purchasers and obtain a fair price for the property. Hoffman v. Anthony, 6 R. I. 282, 75 Am. Dec. 701, and note 704. According to the court's finding the land sold for a fraction more than one-third of its value, and it cannot be disputed that this is the result of the fraudulent conduct of Reisenberg and Minchew in selling the land at the noon hour. At the time of the sale the Hancock Insurance Company was the mortgagee, as shown by the records. Reisenberg's assignment, which vested him with the power to sell, was not filed and recorded until after the sale. Reisenberg said that Minchew came to bid on the land if he wanted to but didn't bid on it. He said he had not notified the appellees because he thought the law ought to control the matter of notice; that he didn't have their interest at heart, because they were able to take care of themselves.

[9] While it is true, as a general rule, that a junior incumbrancer is not entitled to notice of a sale made under a power in a mortgage, it is also true that any fraud or misconduct which results in preventing a fair sale and competitive bidding renders the sale voidable. It is said in King v. Platt, 37 N. Y. 155, that while the law secures to the creditor his just demands, and sequestrates the property of the debtor to satisfy it, still it sedulously guards his interest in all the various steps taken leading to a sale of his property, and it will not tolerate the slightest undue advantage over him even by pursuing the strictest form of the law, and that occupying the position of an advantage it behooves the complainants to pursue their remedy with scrupulous care lest they should inflict an injury on one who is comparatively powerless, and, further, that "a court of equity justly scrutinizes the conduct of a party, placed by the law in a position where he possesses the power to sacrifice the interests of another in a manner which may defy detection, and stands ready to afford relief on very slight evidences of unfair dealing, whether it is made necessary by moral turpitude, or only by a mistaken estimate of others' rights." See, also, Longwith et al. v. Butler, 3 Gilman (Ill.) 32; Burr v. Borden, 61 Ill. 389; Montague v. Dawes, 96 Mass. (14 Allen) 369; Briggs v. Briggs, 135 Mass. 306; Jencks v. Alexander, 11 Paige (N. Y.) 619. This principle is recognized by the courts of this state. The Supreme Court said, in the case of Thornton v. Goodman, 216 S. W. 147:

"The relation of the parties would make it the duty of the court to scrutinize very closely every act of the trustee in the execution of the trust."

The Beaumont court, in Zeiss v. Bank (Tex. Civ. App.) 189 S. W. 524, says that the proposition that the trustee in a deed of trust is the special agent of both parties, and must act with absolute impartiality and with fairness to all parties concerned, and the further proposition that a sale for an inadequate price by a trustee will be set aside if there is proof of undue advantage, "are correct legal propositions."

[10] Inadequacy of price alone is not ordinarily sufficient ground for setting aside a trustee's sale, but, when it is shown that such inadequacy is due to any misconduct, fraud, or unfairness on the part of the trustee or mortgagee, equity will avoid the sale.

If Reisenberg really bought the land for himself, then an unlawful combination is shown with Minchew, who told Williams in Reisenberg's presence that he, Minchew, brought the $3,400 cashier's check, which he showed Williams, along to protect Boeler's interest, if necessary. Minchew did not bid, and Reisenberg was the sole bidder.

We approve the trial court's finding, and affirm the judgment.

## On Motion for Rehearing.

[11] The appellant has drawn several inferences from language of the opinion which he misconstrues, and which are altogether unwarranted and uncalled for. For instance, he insists that this court has in effect held that the failure to give personal notice of sale under a mortgage is such an irregularity as makes the sale void. We made no such holding nor is the language quoted from the opinion susceptible of any such construction. It is insisted that the plaintiff's petition does not charge fraud, and that we erred in holding that the allegations of the petition with reference to the issue of fraud, if insufficient, could be supplied by reference to the answer. In the first place, there is no proposition in appellant's brief challenging the sufficiency of the plaintiff's allegations of fraud. We should not therefore have discussed the question. We were misled by the argument in appellant's brief, wherein the sufficiency of the plaintiff's allegations to show fraud were assailed. We have the right to assume that counsel will be fair and true to the record in their state-

ments and arguments. A reference to the transcript will show that under one or more assignments the insufficiency of the petition in this particular is assailed; but in his brief appellant has abandoned that ground of complaint by failing in any proposition to question the sufficiency of the petition in that respect. Aside from this, we find, by referring to the pleading itself, that both conspiracy and fraud are specifically and repeatedly charged in verbis and in effect; but, if there were no specific allegations of fraud, the appellant's pleadings clearly raise the issue, and the rule announced in the original opinion is sustained by numerous authorities. Sovereign Camp, W. O. W., v. Hubbard (Tex. Civ. App.) 248 S. W. 732; Sovereign Camp, W. O. W., v. Cooper (Tex. Civ. App.) 208 S. W. 550; Pope v. Kansas City, M. & O. R. Co. (Tex. Sup.) 207 S. W. 514; Lyon v. Logan, 68 Tex. 521, 5 S. W. 72, 2 Am. St. Rep. 511; Tittle v. Bartholomae (Tex. Civ. App.) 207 S. W. 176; Martinez v. De Barroso (Tex. Civ. App.) 189 S. W. 740; Peoples v. Brockman (Tex. Civ. App.) 153 S. W. 907.

[12] In American National Bank v. Haggerton (Tex. Civ. App.) 250 S. W. 279, the petition failed to allege that the plaintiff had tendered to defendant an abstract showing good and merchantable title. The defendant, however, alleged that this had not been done, and assumed the burden of proof upon that issue. This court said:

"Having presented the issue, and both parties having tried the case upon that theory in the lower court, we are convinced, upon reconsideration, that the judgment should not be reversed upon this ground. The rule is well established in this state, that where the plaintiff's petition fails to make a necessary averment of fact but the omission is supplied by such an allegation in the answer, even though where a demurrer to the petition upon that ground is overruled, the defect in the petition is unimportant and the appellate court is not justified in reversing the case for that reason," citing numerous authorities.

[13, 14] Moreover, since the promulgation of rule 62a, defects in pleading are not such a prolific source of reversal as before. There is now no presumption that an error in overruling special exceptions to pleadings is ground for a reversal. The burden is upon the complaining party to show injury. Golden v. Odiorne (Tex. Com. App.) 249 S. W. 822; Trinity & B. V. Ry. Co. v. Geary (Tex. Civ. App.) 169 S. W. 201; Thornton v. Goodman (Tex. Civ. App.) 185 S. W. 926; Southern Commercial & Savings Bank v. Combs (Tex. Civ. App.) 203 S. W. 1169. Appellant cannot claim substantial injury by reason of the court's rulings in this case. The trial was before the court. Not only the appellant's pleading, but the evidence introduced by him, show that the issue of fraud in making the sale was the paramount issue in the case.

It was fully understood by the court and by both parties to be the controlling issue. Since it was tried upon that theory in the court below, it must stand or fall upon the same issue here.

In the original opinion we stated that the assignment "was not filed and recorded until after the sale." There is some doubt about the correctness of this statement. Riesenberg first testified that he sold the land at the noon hour. He further testified that he and Minchew started out in the country to see the land about 9 o'clock on the morning of the day of sale, and it was "about 12:30 o'clock when I got back from the land." He is evidently mistaken in this, because the file mark upon the assignment made by the clerk is dated at 12 o'clock m. The reasonable presumption is that he did not file until after he returned. The file mark on the assignment corroborates his first statement that he sold the land at the noon hour. In any event, according to his testimony, there is not more than 30 minutes between the time when the assignment was lodged with the clerk and the actual sale of the premises. We may safely infer that it had not been recorded at the time of the sale, but the matter is too trifling upon which to base even a quibble. We will correct our statement, however, by saying that the assignment was filed with the clerk a few minutes before the sale.

The other grounds of the motion are without merit, and are disposed of by what we have said in the original opinion, and the motion is overruled.