LIPSEY, et al, Appellants, v. CROSSER, et al, Respondents.

(257 N. W. 125.)

(File No. 7567.   Opinion filed November 8, 1934.)

See, also, 62 S. D. 160, 252 N. W. 23.

*Philo Hall, Albert Matson,* and *Sam Kramer,* all of Brookings, for Appellants.

*B. H. Schaphorst* and *Cheever, Collins & Cheever,* all of Brookings, for Respondent.

CAMPBELL, J. This action was instituted by plaintiff Lipsey, owner of certain real estate, and the Co-operative Company, holder of a second mortgage thereon, against defendant Crosser, assignee of a first mortgage on the premises, to vacate Crosser's foreclosure of the first mortgage. Relevant facts may be gleaned from the record substantially as follows:

In 1926 one Christensen, who owned two adjoining town lots in Brookings, mortgaged the same to Horace Fishback to secure $150 due May 3, 1929, with interest at 8 per cent until maturity and 10 per cent thereafter. On August 25, 1926, Fishback assigned said note and mortgage to one Kellogg residing in Tacoma, Wash., for whom Fishback (and his son Van Fishback) acted locally as financial agents. In September, 1926, Christensen conveyed the premises to plaintiff Lipsey; the contract for the transfer being made in the bank, of which bank Fishback was president. At that time Lipsey was able to pay the $150 mortgage and desired to do so, but was advised by Van Fishback that payment would not be accepted prior to maturity. Subsequently the first year's interest on the $150 mortgage was paid. No one thereafter made any demands upon Lipsey for the payment of this mortgage, either as to principal or interest, or gave him any notice of the maturity thereof. He had purchased subject to the mortgage, however, and was at all times chargeable with constructive notice of its contents. Immediately after purchasing the lots, Lipsey proceeded to erect thereon a tile building, approximately forty feet square, denominated in the record as a "pop factory." Lipsey claims that the original construction cost of the building was $3,831.67, exclusive of his own labor and the cost of the lots, and he subsequently made some improvements thereon. Some of the building materials were purchased by Lipsey from his coplaintiff Farmers' Co-operative Company, and in the spring of 1927 Lipsey mortgaged the premises to the Co-operative Company for $1,189.15, being the unpaid balance due them on their materials bill. This lien of the Co-operative Company was in the form of two mortgages, one for $589.15, and one for $600, which were promptly recorded. In the spring of 1930 Lipsey leased the premises to a tenant at the rate of $35 per month, which rental was to be paid, and in fact was paid, to the Co-operative Company. It was agreed between Lipsey and the Co-operative Company that such rentals

would be applied to take care of the taxes against the premises (which were delinquent since 1926 and amounted at that time, with accrued interest, to about $240) and the principal and interest of the $150 first mortgage and thereafter to their own lien. The Co-operative Company collected the rentals from month to month but made no payments on the taxes or first mortgage, applying the money to their own lien, which was thereby reduced to approximately $600. Of the failure of the Co-operative Company to pay the taxes or take care of the prior mortgage, Lipsey was not advised save only as he might be chargeable with constructive notice that such items continued undischarged of record. So far as concerns Lipsey, the Co-operative Company, and the tenant in possession, the situation thus continued until October, 1931.

We turn now to the facts concerning defendant Crosser's connection with the matter. Crosser was a young man, married, employed as a clerk in a furniture store at a salary of $140 per month. He was a boyhood friend, schoolmate, and intimate companion of Mr. Herbert Cheever, one of his attorneys herein, who personally acted for him in connection with all the transactions hereinafter stated. The Co-operative Company had their office and place of business in Brookings, and had from time to time been clients of Mr. Cheever or his firm, though there was no general retainer. This relation of attorney and client appears to have terminated about April, 1930, excepting for its continuance as to one or two small pending matters which had no relation to Lipsey or his affairs. Mr. Cheever knew that the Lipsey premises were rented for $35 per month; that the Co-operative Company had a lien thereon and was receiving the rentals. Mr. Cheever learned of the existence of the first mortgage in July, 1930. He states that he did not acquire this information as a result of any relation of attorney and client between himself and the Co-operative Company, but through his investigation of Lipsey's affairs in endeavoring to collect other items from Lipsey, who appears to have been quite heavily indebted to various persons. Mr. Cheever informed his friend Crosser of the existence of the first mortgage, the condition thereof, and the amount due thereon, and also of the tax and other subsequent liens against the premises. Crosser, who had never previously owned mortgages or loaned money on real estate, decided to buy this mortgage as an investment. He says, "My sole

purpose at the time I bought it was to collect the interest and principal." The assignment of mortgage from Kellogg to Crosser was dated and acknowledged in the state of Washington on August 13, 1930. It was delivered by Kellogg's agent Fishback to Mr. Cheever, attorney for Crosser, on September 8, 1930, and was paid for on that day by a check in the amount of $200 signed by Mr. Cheever's firm as trustees, payable to Mr. Fishback's bank. Of this amount $179.50 went to Kellogg, and the balance of $20.50 was retained by Fishback as his commission for handling the matter. Crosser says that he paid the $200 to Herbert Cheever in cash. He states that he does not know where he obtained this particular sum, and does not know whether he made the payment in Mr. Cheever's office or in the store where he worked. He states that the assignment in fact was never delivered to him, but was left with Mr. Cheever at all times, and that he had instructed Mr. Cheever to foreclose the mortgage before he received the assignment. Neither Mr. Cheever nor Crosser ever advised either Lipsey or the Co-operative Company of Crosser's ownership of this note and mortgage or made any effort whatsoever to collect from either of them, though Mr. Cheever says that he had a large number of claims against Lipsey and always went to see him or wrote him regarding them. He says, however, that this particular note and mortgage was placed with him for foreclosure and not for collection.

The assignment of mortgage from Kellogg to Crosser was recorded on the day of its delivery, September 8, 1930, and foreclosure thereof was immediately undertaken, the notice of sale bearing date September 9, 1930, the first publication thereof being on September 12, 1930, and the sale being set for October 11, 1930, at 10 o'clock a. m. It was the usual custom of attorneys practicing in Brookings county to conduct their foreclosure sales at 2 o'clock p.m. The sheriff of the county testified that during his incumbency in office Mr. Cheever's firm had conducted seventy or eighty foreclosure sales, most of which were set for 2 o'clock p.m. and that he could not recall any instance, save the Crosser sale, where any other hour was fixed, though he would not want to state definitely that such an instance never had occurred. The notice of sale was not published in either of the two legal newspapers at Brookings, the county seat, and the situs of the property, but was published

in the Elkton Record. Elkton is a town of about 850 population in the extreme southeast corner of Brookings county. The Elkton Record has been in existence for some fifty years. Its circulation in October, 1930, was about 625; the bulk thereof being in the vicinity of Elkton. Of its total circulation at that time only about 15 copies went to Brookings post office, which copies included exchanges with the two Brookings papers and copies sent to the county officers. Neither Lipsey nor the Co-operative Company subscribed to the Elkton Record. Mr. Cheever's firm was not accustomed to publish notices in that paper, and had published only one notice of foreclosure sale therein prior to the Crosser notice. The publisher of the Elkton Record states, however, that in the spring of 1930 his paper had supported the candidacy of Mr. Herbert Cheever for political office, and that thereafter he had told Mr. Cheever that he would appreciate receiving some of the business of Mr. Cheever's firm in the form of publication of legal notices. The sale was conducted by the sheriff at the day and hour fixed in the notice, and the property was struck off to Crosser upon a bid in his behalf by Mr. Cheever for the sum of $262.19; being the amount due on the mortgage plus costs of sale. There were no other bidders. On the same day the sheriff executed affidavit and certificate of sale, which, together with proof of publication, were immediately filed for record and recorded. One year and two days thereafter, on October 13, 1931, Crosser being still the owner of the certificate of sale, sheriff's deed was issued to him and recorded on the same day, and on the afternoon of that day Mr. Herbert Cheever notified the Co-operative Company of the foreclosure and the sheriff's deed, and informed the company that his client Crosser would thenceforth collect the rents on the premises. This was the first information the Co-operative Company had of the acquisition of the mortgage by Crosser or of the foreclosure thereof.

At the time Crosser purchased the property on foreclosure sale for $262.19, taxes outstanding and unpaid against the premises amounted with interest to $256. As to the value of the property at that time, plaintiffs contend that it was in the vicinity of $4,000. The trial court found that its fair value at that time was "from $2,000 to $2,500." Crosser, who said that he had looked the

property over before buying the mortgage, testified that, in his opinion, its value "might have been $2,000."

Lipsey meantime had moved to Chamberlain, S. D. He had no actual knowledge of the acquisition of the mortgage by Crosser or the foreclosure thereof until the Co-operative Company got in touch with him after Mr. Cheever had called upon them and informed them of the situation. They did not get this information to Lipsey until November 11, 1931, and on the next day the present action was instituted to set aside the foreclosure. The taxes against the premises continue unpaid, and plaintiffs in their complaint tendered the amount which Crosser bid and paid for the premises at the foreclosure sale, together with interest, and again made a valid tender thereof in currency during the trial. Findings, conclusions, and judgment below were in favor of the defendant, from which judgment and from the denial of their application for a new trial plaintiffs have appealed. A motion to dismiss the appeal was denied (62 S. D. 160, 252 N. W. 23), and the matter is now before us on the merits.

Both respondent Crosser and his attorney, Herbert Cheever, denied that there was any fraudulent or wrongful intent or ulterior motive of any kind in their proceedings here involved, and the trial court so found.

The facts remain, however, that both respondent and his attorney were fully informed as to all the circumstances when respondent acquired this first mortgage. They knew that the Co-operative Company had a lien upon the equity of redemption and were collecting the rentals. They knew, taking their own figures, that the equity of redemption had a fair clear value of at least $1,744 (Crosser's valuation of $2,000, less accrued taxes and interest of $256). They knew that the Co-operative Company would have paid the first mortgage upon demand. They made no such demand, but began foreclosure immediately, and said nothing to any interested party until the afternoon of the day that the foreclosure ripened into sheriff's deed. The notice of sale was published in a newspaper in another and smaller town though the property itself was located in Brookings. The sale was set for an hour which was unusual in Brookings county. Respondent acquired the property for approximately 15 per cent of its admitted clear value of $1,744,

accepting his own estimate of that value. Respondent pursued in all respects the letter of the law. It would tax human ingenuity, however, to devise a scheme falling within the letter of the law which would be better adapted or more likely to accomplish precisely the result which was accomplished in this case, to wit, to acquire property for 15 per cent of its value and to destroy a lien upon the equity of redemption.

It is the law that a mortgage containing, as this one did, a power of sale, may be foreclosed by advertisement. Section 2876, R. C. 1919, as amended by Laws 1927, c. 163 and section 2877. It is the law that the notice of sale may be published in any legal newspaper in the county if there is such. Section 2879, R. C. 1919, as amended chapter 178, Laws 1931. It is the law that the sale may be conducted at any hour designated in the notice between 9 o'clock a. m. and 5 o'clock p. m. Section 2881, R. C. 1919. It is the law that the mortgagee or his assignee "may fairly and in good faith purchase" at the sale. Section 2884, R. C. 1919. It cannot be, and it is not, contended upon this record that respondent did or omitted any act which renders his foreclosure void as a matter of law. The claim is that his foreclosure title is voidable in equity; appellants offering to do equity on their part by tendering him the amount of his bid with interest. Cf. Gillette v. Abrahams (1919) 42 S. D. 316, 174 N. W. 745.

A mortgage situation from its inception to its conclusion is and has been from the earliest times within the field of equity jurisdiction. A bill in equity was long the only permissible method to enforce a mortgage, and the fact that our statute permits the enforcement of a power of sale mortgage by sale at public auction pursuant to published notice does not, and never can, remove the situation beyond the reach of a court of equity. The power of sale in a mortgage is a power in trust in relation to realty. Section 405, R. C. 1919; Brown v. Hall (1913) 32 S. D. 225, 142 N. W. 854. The holder of such power owes to the mortgagor and to all interested in the equity of redemption a duty of good faith and fair and equitable dealing (Wiltsie on Mortgage Foreclosure [4th Ed] § 883; Jones on Mortgages [8th Ed.] § 2451), and a court of equity will require him to act accordingly, and, if he has pursued a course of conduct that is unconscionable and inequitable,

he cannot successfully justify himself merely by pleading compliance with the letter of the law, or by saying with Shylock, "I cannot find it; 'tis not in the bond."

■ It is undoubtedly the rule that inadequacy of price, standing alone, will not usually warrant equity in avoiding a foreclosure sale. Some courts have held that equitable relief may be had where the inadequacy is so gross as to "shock the conscience of the court" (see annotation, 8 A. L. R. 1001 et seq.), but we need not undertake to deal in this case with any question of inadequacy standing alone. This court has held that there is no obligation on a mortgagee to bid a greater amount than is due on his mortgage plus costs of sale, and that in such a situation mere inadequacy of consideration will not invalidate the sale; the court being convinced that there is no fraud, bad faith, or undue advantage. Kaufman v. Farmers' State Bank (1922) 45 S. D. 515, 189 N. W. 511; Loomis v. Stoddard (1919) 42 S. D. 272, 173 N. W. 859.

It is also the rule, however, that inadequacy of price is highly material in the eyes of equity, even though standing alone it would not warrant relief. See annotation, 8 A. L. R. 1001, at page 1007 et seq. That rule has always had the recognition of this court, and in Stacy v. Smith (1896) 9 S. D. 137, 68 N. W. 198, 199, it is said: "A court of equity, in the exercise of its equitable powers, will scrutinize with care sales made under powers of sale contained in the mortgage; and, where there is great inadequacy of consideration, it will be astute in extracting from the facts of the case sufficient to justify annulling the sale."

■ In the instant case we are convinced that the facts not only justify, but very clearly require, the avoidance of the sale. Respondent made not the slightest effort to collect his debt after he acquired it. He was fully informed of all the circumstances and of the interest of the Co-operative Company in the equity of redemption, yet the whole course of conduct pursued by respondent or by his attorney in his behalf announces more eloquently than words that it was hoped and intended from a time prior to the acquisition of the mortgage that things might come to pass exactly as they did come to pass; namely, that respondent might acquire and foreclose this mortgage without any interested persons actually finding out about it and that the period of redemption might

elapse while they continued in actual ignorance (regardless of any constructive notice), so that the sale might ripen into deed and respondent might acquire this property for a fraction of its value and cut out the interests which he knew existed in the equity of redemption. Extremely apt in its application to this situation is the language of the Massachusetts court in Bon v. Graves (1914) 216 Mass. 440, 103 N. E. 1023, 1026: "No one of these circumstances standing alone would show bad faith on the part of Graves in making the foreclosure. But collectively they gain a force which they fail to possess separately. Taken together, they show a failure to use that good faith which the law requires in executing a power, even though on the face of the record there was a technical compliance with its terms."

It is inescapable from this record viewed in its entirety that the intention of respondent from the very beginning was, not to secure payment of the debt which he bought, but to secure title to the land without the knowledge of the mortgagor or those interested in the equity of redemption. See Newman v. Ogden (1892) 82 Wis. 53, 51 N. W. 1091. See, also, Nichols v. Flagg (1902) 24 R. I. 30, 51 A. 1039; Hedlin v. Lee (1911) 21 N. D. 495, 131 N. W. 390; Lunde v. Irish (1923) 50 N. D. 312, 195 N. W. 825; Winbigler v. Sherman (1917) 175 Cal. 270, 165 P. 943; Reisenberg v. Hankins (Tex. Civ. App. 1924) 258 S. W. 904; Hayden v. Smith (1927) 216 Ala. 428, 113 So. 293; Talley v. Webster (1930) 222 Ala. 188, 131 So. 555; Guels v. Miss. Valley Trust Co. (1932) 329 Mo. 1154, 49 S. W. (2d) 60.

The trial court has purported to find as facts in this case that there was no conspiracy between respondent and his attorney with the object or intent of defrauding either of the appellants and that the consideration was not inadequate. Manifestly, 15 per cent of the admitted clear value of the equity of redemption is an inadequate consideration. Whether the conduct of respondent, or respondent and his attorney, as shown by this record, manifests so much lack of fairness and good faith that it ought to be christened "fraudulent," is not, we think, material. First, last, and always a mortgage situation is an equity situation. No mortgagee holding a power of sale can ever deal at utter arm's length with those whom he knows to be the mortgagor or the successors of the mortgagor or persons legitimately interested in the equity of redemp-

194

tion. He must treat them fairly, equitably, and with the highest good faith. Our statute (just as did the Wisconsin statute involved in Newman v. Ogden, supra) specifically qualifies the right of a mortgagee to purchase at a foreclosure sale upon advertisement by providing that he may so purchase "fairly and in good faith." Section 2884, R. C. 1919. That mere compliance with the letter of the law is not always sufficient to establish good faith is clearly indicated by our statutory definition (section 11, R. C. 1919) to the effect that "good faith consists in an honest intention to abstain from taking any unconscientious advantage of another, even through the forms or technicalities of law, together with," etc. Conceding that the conduct of respondent and his attorney in this case might not deserve to be described as "fraudulent," we are nevertheless convinced, upon the undisputed facts appearing in this record, that it fails to exhibit that degree of fair dealing and good faith which a mortgagee owes to those whom he knows to be interested in the mortgage res and the equity of redemption. We are satisfied that appellants are entitled upon this record to have the deed canceled, the sale set aside, and an accounting of respondent's possession.

The judgment and order appealed from are therefore reversed, and the cause remanded for further proceeding in harmony with the views above indicated.

ROBERTS, P. J., and POLLEY and RUDOLPH, JJ., concur. WARREN, J., dissents.