The sole legal question presented in this case is whether a lending institution that foreclosed on a mortgage and then was the only bidder at the foreclosure sale breached its duty of fairness and good faith to the borrowers, when its bid at the foreclosure sale was an amount less than the amount due under the terms of the note secured by the mortgage and was so inadequate, *Page 161 
the borrower and the guarantors contend, as to shock the conscience.
 Facts
The basic facts are not disputed. Regions Bank foreclosed on a mortgage given as security for a promissory note executed on May 12, 1999, in the amount of $2,000,000 by Mt. Carmel Estates, Inc. ("Mt. Carmel"), and guaranteed by Charles M. Sisco, David Wall, Mychiallyn Wall, and Myron Wilson (hereinafter referred to collectively as "the guarantors").
At the foreclosure sale, Regions Bank, the only bidder, bid $1,242,000, an amount less than the unpaid balance on the note, creating a deficiency. Regions Bank sued Mt. Carmel and the guarantors to collect the deficiency and demanded a judgment against the defendants, jointly and severally, for the sum of $375,122.16, attorney fees in the amount of $30,000, and interest "at the Index rate plus .50% until paid [in] full and costs." After the defendants answered, Regions Bank filed a motion for a summary judgment. Mt. Carmel and the guarantors opposed the motion, contending that there was a genuine issue of material fact presented in that the fair market value of the foreclosed property so greatly exceeded the amount of Regions Bank's bid at the foreclosure sale as to shock the conscience. The trial court entered a summary judgment in favor of Regions Bank, and against Mt. Carmel and the guarantors, with the exception of Myron Wilson, who had entered into a pro tanto release before the judgment was entered. We affirm.
As security for the $2,000,000 promissory note, Mt. Carmel mortgaged two parcels of real property: one parcel had been subdivided into 61 lots; the other parcel consisted of 18.23 acres of undeveloped land. After executing the note, Mt. Carmel sold 13 lots from the first parcel and reduced the amount of the note, including principal, interest, and late fees, to $1,611,686. Mt. Carmel then defaulted. On April 28, 2000, Mt. Carmel and the guarantors entered into a contract with Enfinger Development to sell the 48 remaining lots of the first parcel and the second parcel of land to Enfinger for $1,205,985; however, this sale was not consummated.[1] Regions Bank foreclosed on the mortgage, and on July 10, 2000, held a foreclosure sale. Regions Bank offered for separate bids each lot in the first parcel and the second parcel, and then offered for bid all of the real property as a whole. Regions Bank, the only bidder at the sale, offered the highest bids on each individual lot and the second parcel and offered the highest bid on the property as a whole. The sum of the separate bids was slightly less than the bid for the property as a whole, which was the sum of $ 1,242,000.[2]
On July 14, 2000, Regions Bank sued Mt. Carmel and the guarantors for the alleged deficiency of $375,122.16, plus interest and attorneys fees and costs. Wilson, one of the guarantors, answered on August 15, 2000. The remaining defendants answered and asserted as an affirmative defense that Regions Bank's claim was barred because, the defendants alleged, Regions Bank had breached its duty of good faith and fairness in conducting *Page 162 
the foreclosure. On February 8, 2001, Regions Bank filed its motion for a summary judgment. On March 6, 2001, Sisco filed his response in opposition to the motion for a summary judgment. On March 8, 2001, Regions Bank filed a motion seeking the dismissal of Wilson, with whom it had entered into a pro tanto release. On March 19, 2001, Regions Bank filed its amended motion for a summary judgment, stating that Wilson had been dismissed in exchange for Wilson's payment to Regions Bank of $130,000. Regions Bank stated that, after application of Wilson's payment to interest, attorneys fees, and principal, there remained a deficiency of $278,640.18. In a supplemental response to Regions Bank's motion for a summary judgment, Mt. Carmel and the remaining guarantors (hereinafter referred to collectively as "the defendants") stated:
 "There are disputed issues of material fact in this litigation involving the amount of the deficiency and the fair market value of the land as of the date of foreclosure. Defendants maintain there is no deficiency other than the one artificially created by [Regions Bank] when it intentionally underbid the property at the foreclosure sale on July 10, 2000. [Regions Bank] breached its duty of good faith and violated its fiduciary duty to the defendants to obtain the highest and best price for the subject property at the foreclosure sale."
On May 22, 2001, the defendants filed a counterclaim, followed on May 23, 2001, by an amended counterclaim, in which they alleged that the price Regions Bank paid for the land — $1,242,000 — was far below the reasonable fair market value of the land and violated the duty of good faith and fairness, which the defendants alleged Regions Bank owed them. The defendants then demanded compensatory and punitive damages and further asked that the foreclosure sale be set aside.
On November 5, 2001, the trial court entered a summary judgment in favor of Regions Bank in the sum of $311,013.20.[3] *Page 163 
In addition, the trial court rendered a judgment in favor of Regions Bank as to the defendants' counterclaim. On appeal, the defendants raise three issues:
 "1. Did Regions [Bank] breach its duty of fairness and good faith owed [the defendants] by not bidding in the amount of the debt at the foreclosure sale, thus creating a false or sham deficiency?
 "2. Did the trial court err in granting a summary judgment to Regions [Bank] before the correct amount of the deficiency was known? *Page 164 
 "3. Did the trial court err in granting Regions [Bank] a judgment on [the defendants'] counterclaim?"
(Defendants' brief, p. 7.)
 Standard of Review
This Court's standard for reviewing a summary judgment has been stated many times, most recently in Potter v. First Real Estate Co., 844 So.2d 540
(Ala. 2002), in which this Court stated:
 "We review a summary judgment de novo. American Liberty Ins. Co. v. AmSouth Bank, 825 So.2d 786 (Ala. 2002).
 "`We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw.'
 "Nationwide Prop. Cas. Ins. Co.[v. DPF Architects, P.C.], 792 So.2d [369] at 372 [(Ala. 2001)], quoted in American Liberty Ins. Co., 825 So.2d at 790."
844 So.2d at 545.
 I.
The defendants state that Regions Bank's alleged lack of good faith and fairness constitutes a defense to Regions Bank's claim, and they also say that Regions Bank's lack of good faith and fairness supports their counterclaim, in which they demanded compensatory and punitive damages.
In their counterclaim, the defendants stated:
 "[Regions Bank], as the mortgagee in the mortgage foreclosure proceeding, owed the Defendants a duty of good faith and fairness in the mortgage foreclosure proceeding and was a trustee with respect to the debtors. [Regions Bank's] claims are barred because [Regions Bank] breached its duty of good faith and fairness owed to the Defendants by intentionally underbidding the value of the property at the foreclosure sale, thus creating a false or sham deficiency.
 "Wherefore the Defendants . . . demand judgment against [Regions Bank] . . . for general compensatory damages, consequential damages and punitive damages in an mount to sufficiently compensate the Defendants . . . and to deter [Regions Bank] . . . and others from such wrongful conduct in the future and that the foreclosure sale which was held on July 10, 2000, be set aside and that the Defendants . . . be granted such other remedies or relief which a jury and/or the Court may deem appropriate."
To support their contention that the trial court erred in deciding their counterclaim adversely to them, the defendants argue:
 "[Regions Bank], as trustee for the debtors, owed a duty to obtain the highest and best price for the property at the foreclosure sale in order to reduce or eliminate the debt. In view of the market value of the property securing the debt, [Regions Bank] could have easily bid in the amount of the debt and eliminated any deficiency. Instead, [Regions *Page 165 
Bank] created an artificial deficiency by intentionally bidding in an amount for the property that was far below its fair market value. [Regions Bank] breached its duty of fairness and good faith with the debtors by not bidding in the amount of the debt at the foreclosure sale."
(Defendants' brief, p. 17.) In support of their position that Regions Bank owed them a duty of fairness and good faith, the defendants citeWood River Development, Inc. v. Armbrester, 547 So.2d 844 (Ala. 1989). InWood River Development this Court stated:
 "When a mortgagee forecloses a mortgage pursuant to a power, the mortgagee becomes a trustee of the debtor/mortgagor, and is bound to act in good faith and adopt all reasonable modes of proceeding in order to render the sale most beneficial to the mortgagor. First National Bank of Opp [v. Wise, 235 Ala. 124, 177 So. 636 (1937)]. This duty is imposed upon the mortgagee foreclosing under a power of sale, because the mortgagee is selling the property, and his interest is diametrically opposed to the interest of the mortgagor, especially if he is the purchaser of the property at the foreclosure sale. In such a case, the mortgagee is in a better position to hinder the sale and render it self-serving. The reasons for imposing such a duty are not present at a judicial foreclosure sale, because there the court, not the mortgagee, is selling the property."
547 So.2d at 847. The defendants further argue that to fulfill its duty to be fair and to act in good faith, and in view of the fair market value of the land, Regions Bank should have bid the amount of the remaining debt, and had Regions Bank done so, there would not have been a deficiency.
Counsel for the defendants candidly admits that he was unable to find an Alabama case to support such a position, but cites a Florida case,Barnard v. First National Bank of Okaloosa County, 482 So.2d 534
(Fla.Dist.Ct.App. 1986), and urges this Court to "follow the logic of the Florida appellate court and reverse the learned trial judge, remanding the case for trial." (Defendants' brief, p. 18.)
In Barnard, the Florida District Court of Appeal stated:
 "We have held that the court is authorized to deny a deficiency if the fair market value of the property exceeds the amount of the debt at the time of the foreclosure sale. Hamilton Investment Trust v. Escambia Developers, Inc., 352 So.2d 883 (Fla. 1st DCA 1977). We have also held that the amount bid at the foreclosure sale is not conclusive on the issue of the mortgaged property's value. Trustees of Central States Southeast and Southwest Areas, Pension Fund v. Indico Corporation, 401 So.2d 904 (Fla. 1st DCA 1981); Kurkjian v. Fish Carburetor Corporation, 145 So.2d 523
(Fla. 1st DCA 1962). The trial court has the duty and discretion to inquire into the fair market value of the property, the adequacy or inadequacy of the sale price, and the relationship, if any, between the foreclosing mortgagee and the purchaser at the foreclosure sale. Indico Corporation, supra; R.K. Cooper Construction Company v. Fulton, 216 So.2d 11
(Fla. 1968).
 "In light of the facts and the evidence in this case, the trial court abused its discretion in granting a deficiency judgment. The undisputed expert testimony showed the fair market value of the seven lots at the time of the sale to be substantially in excess of the debt owed to appellee. Further, the purchaser and the mortgagee were one and the same and the mortgagee was the only bidder at the foreclosure sale. Last, fair market *Page 166 
value has been defined as `the sum arrived at by fair negotiation between an owner willing to sell and a purchaser willing to buy, neither being under pressure to do so.' Flagship Bank of Orlando v. Bryan, 384 So.2d 1323 (Fla. 5th DCA 1980). A witness for the appellee admitted at the deficiency hearing that the bank was under pressure to sell the lots and that its bid was lowered because the bank would not be able to sell the lots for what they were worth. The bid price was therefore more an indication of a `quick sale' value than of the property's true fair market value."
482 So.2d at 535-36. In their reply brief to this Court, the defendants "admit that the able attorney for Regions [Bank] `duly and properly' conducted the foreclosure sale on that date," and state that they "are not contesting the mechanics of the foreclosure sale itself," but "are alleging that the amount bid by Regions [Bank] on that date was so far below the fair market value of the property that it should shock the conscience of the Court." (Defendants' reply brief, p. 4.) The defendants also state:
 "We are not contesting the procedure that was followed in conducting the foreclosure sale. We are contesting the substance behind the procedure, the fact that Regions [Bank] knew the property would bring much more than it bid at foreclosure, knew that it had personal guarantees from which to collect any deficiency, knew it had a willing buyer in Enfinger and knew that if it sold the lots individually it would realize a profit by collecting much more money than it bid at foreclosure as well as a deficiency judgment. In view of these known facts, [Regions Bank] intentionally created a deficiency judgment by not bidding the amount of the debt at the foreclosure sale. By all the evidence presented, the affidavits concerning the value of the property and the appraisals, [Regions Bank] ran no risk to itself by bidding in the amount of the debt. It would be made whole. The [defendants], on the other hand, have been saddled with a huge deficiency judgment, a needless deficiency judgment."
(Defendants' reply brief, p. 6.) Regions Bank counters that "the purchase price at a properly conducted foreclosure sale is deemed conclusive of the fair and reasonable price at the sale." (Regions Bank's brief, p. 13.) In support of its argument, Regions Bank cites BFP v. Resolution TrustCorp., 511 U.S. 531 (1994), Wood River Development, Inc. v. Armbrester,547 So.2d 844 (Ala. 1989), and Breen v. Baldwin County Federal SavingsBank, 567 So.2d 1329 (Ala. 1990).
In BFP, the United States Supreme Court interpreted the meaning of the phrase "reasonably equivalent value" found in 11 U.S.C. § 548(a)(2)(A), in the context of a foreclosure sale. That section allows the trustee in bankruptcy to avoid a fraudulent transfer where a debtor had an interest in property that was transferred within one year of the filing of the bankruptcy petition, where the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer and where the debtor received less than a "reasonably equivalent value" in exchange for the transfer. The Court stated:
 "[M]arket value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very antithesis of forced-sale value. `The market value of . . . a piece of property is the price which it might be expected to bring if offered for sale in a fair market; not the price which might be obtained on a sale at public auction or a sale forced by the necessities of the *Page 167 
owner, but such a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular . . . piece of property.' Black's Law Dictionary 971 (6th ed. 1990). In short, `fair market value' presumes market conditions that, by definition, simply do not obtain in the context of a forced sale.
 "Neither petitioner, petitioner's amici, nor any federal court adopting the Durrett [v. Washington National Insurance Co., 621 F.2d 201 (1980),] or the [In re] Bundles[, 856 F.2d 815 (1988),] analysis[4]
has come to grips with this glaring discrepancy between the factors relevant to an appraisal of a property's market value, on the one hand, and the strictures of the foreclosure process on the other. Market value cannot be the criterion of equivalence in the foreclosure-sale context. The language of § 548(a)(2)(A) (`received less than a reasonably equivalent value in exchange') requires judicial inquiry into whether the foreclosed property was sold for a price that approximated its worth at the time of sale. An appraiser's reconstruction of `fair market value' could show what similar property would be worth if it did not have to be sold within the time and manner strictures of state-prescribed foreclosure. But property that must be sold within those strictures is simply worth less. No one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques. And it is no more realistic to ignore that characteristic of the property (the fact that state foreclosure law permits the mortgagee to sell it at forced sale) than it is to ignore other price-affecting characteristics (such as the fact that state zoning law permits the owner of the neighboring lot to open a gas station). Absent a clear statutory requirement to the contrary, we must assume the validity of this state-law regulatory background and take due account of its effect."
511 U.S. at 537-39 (citations and footnotes omitted).
Regions Bank argues that Wood River Development held that "in a foreclosure sale where no evidence of fraud, collusion, or other irregularity exists, mere inadequacy of price would not void the sale." (Regions Bank's brief, p. 14.) We note, however, that Wood RiverDevelopment involved a judicial foreclosure sale, conducted by the court register, and that the sale here was conducted by the mortgagee, under the powers granted in the mortgage. While similar, Wood RiverDevelopment is not nearly as helpful as Breen, the facts of which are nearly identical to the facts in this case. In Breen, this Court stated:
 "Breen argues that his affidavits were sufficient to create a genuine issue of fact as to the commercial reasonableness of the foreclosure sale. As previously noted, the Bank had the burden of showing that it was entitled to recover from Breen the amount that it had alleged was due. The record shows that the Bank made a prima facie showing that it was entitled to a judgment as a matter of law; therefore, the burden shifted to Breen to present evidence tending to show that a triable issue of fact existed. Breen submitted two affidavits in which he stated that, in his opinion, the Bank *Page 168 
had paid a commercially unreasonable price for the property that was the subject of the foreclosure sale.
". . . .
 "After carefully reviewing Breen's affidavits, we conclude that they were sufficient to prove only that at one time some of the lots in question had had a fair market value of approximately $25,000; that, thereafter, the fair market value of the lots began to drop as the result of a slump in the real estate market; and that the Bank purchased the lots at the foreclosure sale for less than Breen thought it should. The affidavits do not provide sufficient information concerning the relative sizes of the lots and their locations or the circumstances surrounding the purchase of the lots by the Bank to support a reasonable inference that the amount paid by the Bank was less than fair market value. Furthermore, even if a reasonable inference could be drawn from the affidavits that the amount paid by the Bank for the lots was less than their fair market value, we could not conclude that the amount paid was so inadequate as to raise a presumption of fraud, unfairness, or culpable mismanagement. See Hayden v. Smith, 216 Ala. 428, 430-31, 113 So. 293 (1927), where this Court stated:
 "`The general rule is that, "where the price realized at the [foreclosure] sale is so inadequate as to shock the conscience, it may itself raise a presumption of fraud, trickery, unfairness, or culpable mismanagement, and therefore be sufficient ground for setting the sale aside." 27 Cyc. 1508.
 "`And, although mere inadequacy of price is not sufficient to that end, it is "always a circumstance to be considered in connection with other grounds of objection to the sale, and will be sufficient to justify setting the sale aside, when coupled with any other circumstances showing unfairness, misconduct, fraud, or even stupid management, resulting in the sacrifice of the property." 27 Cyc. 1508; Holdsworth v. Shannon, 113 Mo. 508, 21 S.W. 85, 35 Am.St.Rep. 719 [(1893)], where the subject is discussed quite fully, with a review of many pertinent cases; 2 Jones on Mortgages (6th Ed.) 1670.'"
567 So.2d at 1331-33 (emphasis added).
In this case, the foreclosure sale was held on July 10, 2000. The property was offered for sale by separate lots and then as a whole. Although Regions Bank was the only bidder, it bid on each lot and the second parcel separately, for a total of $1,241,470, and it bid $1,242,000 for the real property as a whole. As stated above, the defendants admit in their brief to this Court that proper notice of the sale was given and that the sale was properly conducted. As the defendants point out, a July 24, 2000, appraisal valued the property at $1,530,000. Assuming that this sum actually represented the fair market value at the time of foreclosure, can we say that Regions Bank's bid of $1,242,000 was so low as to shock the conscience? We think not.
For the reasons stated above, we affirm the summary judgment in favor of Regions Bank on the original complaint in the amount of $311,013.20, and in favor of Regions Bank on the defendants' counterclaim.
 II.
The defendants argued to the trial court, in their brief in opposition to Regions Bank's summary-judgment motion, filed on May 22, 2001, that the amount of the deficiency, if any, could not be established at that time. The defendants stated: *Page 169 
 "The amount of the deficiency cannot be established at this time. There is a disputed issue of material fact with regard to the amount of the deficiency, if any. Assuming the Court finds that the defendants owe [Regions] Bank a deficiency, its amount is undetermined at this time. At first, [Regions Bank] asked for a deficiency in the amount of $375,122.16. Affidavit of Steve Monger, Exhibit A to [Regions Bank's] first motion for summary judgment. Later, by amending its motion for summary judgment, [Regions Bank] asked for a deficiency judgment in the amount of $278,640.18. Since that time, [Regions Bank] has sold a portion of the foreclosed land and has a contract on the remainder, which has not closed. . . . Consequently, the amounts to be credited have not as yet been established."
In their brief to this Court, the defendants make the following argument:
 "The amount of the deficiency cannot be established at this time. There is a disputed issue of material fact with regard to the amount of the deficiency, if any. Regions [Bank] sold the undeveloped acreage (18.2 acres) on December 31, 2000, to Enfinger for about $109,000, about $8,500 more than what [Regions] Bank bid for it at the foreclosure sale. . . . Regions [Bank] asserted it had a contract with Enfinger Development, Inc. to purchase the remaining lots en masse for $1,150,033 on September 1, 2001, a price in excess of its bid price. . . . There is nothing else in the record indicating whether or not [Regions] Bank actually sold any of the property prior to the entry of the judgment.
 "Regions [Bank] is under a duty to apply any profit realized from the sale of the foreclosed property to the debt. See Springer v. Baldwin County Federal Savings Bank, 562 So.2d 138 (Ala. 1990). There is no evidence before the trial court from which to determine any credits allowed to the [defendants] other than the sale of the undeveloped land and a contract to sell the remaining lots after the time for redemption is expired. Consequently, the amounts to be credited to the defendants have not as yet been established."
(Defendants' brief, p. 19.)
In Springer v. Baldwin County Federal Savings Bank, 562 So.2d 138
(Ala. 1990) ("Springer I"), this Court stated:
 "The profit realized by the mortgagee upon resale of foreclosed property during the redemption period is derived from the value of the property itself. The mortgagee, as trustee for the mortgagor, is obligated to apply that profit realized after foreclosure and during the redemption period to the reduction of the mortgagor's debt, no less than when timber, oil, gas, or minerals are taken and sold. For the mortgagee to be allowed to do otherwise would violate the duty owed the mortgagor."
562 So.2d at 140.
Springer v. Baldwin County Federal Savings Bank, 597 So.2d 677 (Ala. 1992) ("Springer II"), is even more applicable to this case. In SpringerII, this Court decided the question of what constitutes "profit" to the mortgagee that sells foreclosed property. This Court stated:
"In Springer I, we held that a
 "`mortgagee who purchases the mortgaged property at a foreclosure sale and then resells it to a third party during the statutory redemption period is required to apply the profit (the sum realized by the mortgagee in excess of the amount it paid at foreclosure) to the reduction of the mortgagor's debt.' *Page 170 
 "562 So.2d at 139. However, we did not specifically define `sum realized' or `profit.'
 "The issue now before this Court is whether the term `profit' or `sum realized' is to be determined with or without consideration of any expenses incurred from the sale of the property by Baldwin County Federal Savings Bank (bank). The bank contends that all of the expenses it incurred in selling the property should be deducted from the amount received to determine the `profit.' Tommy Springer contends that the amount of the sale to the third party ($99,000) is the amount realized to the bank and that the bank must bear its own expenses.
 "For a history of this case, see Springer I. However, for the purposes of this appeal, we set out the following pertinent facts. Springer defaulted on a note to the bank in an amount over $100,000. That note was secured by certain real property. The bank, as mortgagee, purchased the property at a foreclosure sale, for $88,200. Subsequently, the bank resold the property to a third party for $99,000. The resale occurred during the one-year statutory period of redemption.
 "As noted above, this Court in Springer I ordered the trial court to credit against Springer's debt the `sum realized by the Bank in excess of the amount it paid for the property at the foreclosure sale.' 562 So.2d at 140. On remand, the trial court found that the bank had incurred certain expenses in making the sale to the third party. These expenses included a $6,920 sales commission; a tax service fee of $45; a title insurance fee of $346.50; a maintenance fee of $385.82; and county taxes of $507.36. These expenses totalled $8,204.68. The trial court then entered a judgment for the bank in the amount of $31,946.34, based on the conclusion that the sum realized, or the profit, is the amount left over after the deduction of the expenses. (After expenses, the bank realized, by the trial court's computation, a `profit' of $2,595.32.)
 "At the outset we would point out that this is not a case involving a redemption. At no time during the one-year period did Springer attempt to redeem the property. Therefore, we are not concerned with what are considered to be `lawful charges' pursuant to the redemption statutes. Rather, we are concerned with those necessary and ordinary expenses incurred in the management of foreclosed property.
 "In Springer I this Court relied on Bartlett v. Jenkins, 213 Ala. 510, 105 So. 654 (1925), for the proposition that the bank, as trustee for Springer, was obligated to apply the profit realized from the sale to Springer's debt. As noted above, this Court did not specifically define `profit'; however, in Bartlett it is clear that the `profit' was determined by subtracting certain expenses from the proceeds of the sale. These included expenses of advertising, selling, and conveying the property.
 "Although this Court in Springer I has held that a mortgagee, in certain circumstances, is in a position of quasi-trustee over the property purchased, we cannot conclude that he is a trustee at his own expense. If this Court were to disallow the recovery of the ordinary and necessary expenses incurred by the bank, we would be thwarting any ultimate benefit to debtors in the future. This is so because a mortgagee (in this case, the bank) would have no incentive to act within the one-year redemption period, because in acting the mortgagee will necessarily spend money, which it would not be allowed to recover. If the mortgagee is disallowed the recovery of *Page 171 
these expenses, it would appear that the natural consequence would be for the mortgagee to be reluctant to expend any money to sell the property, and thus there would arise the possibility of no benefit to the debtor."
597 So.2d at 677-78.
In its brief to this Court, Regions Bank argues that its bid of $1,242,000 was 81% of the appraised value of $1,530,000, based on an appraisal made only two weeks after the sale, and Regions Bank points out that this appraisal contemplated a long-term development and subdivision marketing plan, not a foreclosure. Regions Bank argues that "anyone purchasing the vacant lots and raw acreage would be required to hold the property for one year before commencing development, thus absorbing the interest cost related to the foreclosure bid for equal period of time." (Regions Bank's brief, p. 17.) Regions Bank further argues that the record shows that "all of [Regions Bank's] attempts to sell the subdivided lots were unsuccessful due to the existence of the Defendants' right of redemption," and that "[t]he right of redemption materially and substantially impaired the value of the property," and that "no reasonable person could have found the bid placed by Regions [Bank] to have been so low as to shock the conscience," and that "the trial court was correct in finding no genuine issue of material fact existed as to the accuracy of the deficiency balance remaining after the application of [Regions Bank's] bid at the foreclosure sale."[5] (Regions Bank's brief, p. 17.)
Based on the foregoing, we conclude that the amount of the bid made by Regions Bank at the foreclosure sale was not so low that it should have shocked the conscience; consequently, we affirm the summary judgment.
This opinion was prepared by Retired Justice Hugh Maddox, sitting as a Justice of this Court pursuant to § 12-18-10(e).
AFFIRMED.
Moore, C.J., and See, Brown, Harwood, and Stuart, JJ., concur.
[1] The record does not reveal why this sale did not take place. In Sisco's affidavit, which appears in the record, Sisco states that he signed the contract with Enfinger in conjunction with a second contract. Sisco stated: "[T]hese two contracts, taken together, would have allowed me . . . to walk away from these developments debt free. . . . Neither contract was implemented, for reasons unknown to me."
[2] The sum of the bids offered for each individual lot and the second parcel amounted to $1,241,470; the bid for the property as a whole was $1,242,000.
[3] The order reads as follows:
 "The Court, having reviewed [Regions Bank's] Amended Motion for Summary Judgment, the pleadings, the Affidavits of Steve Monger, [chairman of Regions Bank in Huntsville,] Terry D. West [vice president/commercial loans of Regions Bank in Huntsville,] and Robert Reynolds [one of Regions Bank's attorneys whose testimony supported Regions Bank's request for attorneys fees] in Support of [Regions Bank's] Motion for Summary Judgment, the Responses in Opposition to Plaintiff's Summary Judgment and Supporting Affidavits, the Responses filed by Defendants and the supporting affidavits and having considered all other admissible evidence, is of the opinion that there is no genuine issue as to any material fact, and that [Regions Bank] is entitled to a judgment as a matter of law. It is, therefore, Ordered, Adjudged, and Decreed as follows:
 "1. Judgment is hereby rendered in favor of Regions Bank and against Defendants, Mt. Carmel Estates, Inc., Charles M. Sisco, Jr., H. David Wall and Mychiallyn Wall, for the principal sum of $278,640.18, interest in the amount of $22,373.02, and attorney fees in the amount of $10,000.00, for a total judgment in the amount of $311,013.20.
". . . .
 "4. Judgment is rendered in favor of [Regions Bank] and against Defendants as to Defendants' counterclaims as amended."
It appears that the trial court accepted the facts as stated in the affidavit of Terry West, dated March 19, 2001, in which he stated:
 "6. At the time of said mortgage foreclosure sale, there was due and owing by the Defendants to Regions Bank the following:
 "Principal $1,559,938.75 "Accrued Interest $ 51,348.24 "Late Charges $ 400.00
"Payoff as of Foreclosure Sale Date $1,611,686.99
 "7. The proceeds of said mortgage foreclosure sale were applied first to the costs and expenses of foreclosure and preforeclosure workout negotiations representing attorney fees and expenses in the amount of $3,926.41 and foreclosure advertising costs of $1,508.76, resulting in net sales proceeds of $1,236,564.83, which proceeds were applied to pay accrued interest of $51,348.24, late charges in the amount of $400.00 with the remaining sum of $1,184,816.59 applied to the outstanding balance of the loan resulting in an after foreclosure deficiency as of July 10, 2000, of the sum of $375,122.16.
 "8. I have reviewed the factual matters set forth in the affidavit of Steve Monger attached to the original Motion for Summary Judgment filed by our attorneys on behalf of Regions Bank on February 8, 2001. Since the filing of that Motion, Regions Bank has settled with the Defendant, Myron R. Wilson, for the sum of $130,000.00 and this Affidavit is offered in support of the Amended Motion for Summary Judgment to which this Affidavit is attached. In exchange for the Pro Tanto Release of Myron R. Wilson, and payment by Mr. Wilson on February 16, 2001, of the sum of $130,000.00, the settlement proceeds were applied as follows:
 "Deficiency Amount
"$375,122.16
 "Attorney fees from July 11, 2000 through February 28, 2001. $10,803.85
 "Accrued interest from July 11, 2000, through January 4, 2001 at which time the interest decreased from 9.5% to 9.0% $18,547.60
 "Accrued interest from January 5, 2001, through February 16, 2001. $4,256.57
"Subtotal $33,518.02 [sic, $33,608.02]
 "Balance Applied to principal balance $96,481.98 [sic]
 "Amended Deficiency Principal $278,640.18 [sic]
 "9. After the application of the $130,000.00 payment from Mr. Wilson, as set forth above, there remained due and owing, as of February 16, 2001, the principal sum of $278,640.18. Interest has continued to accrue subsequent to February 16, 2001, at the variable rate of interest as provided under the note which rate was equal to 9.00% per annum from February 16, 2001, which is equal to a daily per diem of $68.70."
[4] Durrett and Bundles state that a foreclosure sale that yields less than 57% of the property's fair market value can be set aside and indicates in dicta that a sale for less than 70% of the property's fair market value can be set aside.
[5] The record contains an affidavit of Terry D. West, a loan officer for Regions Bank, who stated:
 "The acreage property was, however, sold on December 31, 2000, for net proceeds in the amount of $106,973.50 or approximately $6,500 more than the amount originally proposed by Enfinger Development, Inc., under the terms of the contract which the Defendants had signed. . . . Of course, the interest accrual upon the value of the 18 acres absorbed substantially all this gain. In addition, [Regions] Bank has been required to pay to date $9,200 in homeowner association fees and has received a special assessment of another $250 per lot for the current year. [Regions] Bank also paid $2,270.55 in ad valorem taxes."